**UNITED STATES of America,
Plaintiff/Appellee,**

v.

**Barbara MOUZIN, Defendant/Appellant.**

**UNITED STATES of America,
Plaintiff/Appellee,**

v.

**Alfonso CARVAJAL,
Defendant/Appellant.**

Nos. 83–5145, 83–5168.

United States Court of Appeals,
Ninth Circuit.

Argued Jan. 10, 1985.

Submitted March 14, 1986.

Decided March 18, 1986.

Robert J. Perry, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff/appellee.

Howard L. Weitzman, Jerald W. Newton, Weitzman & Furstman, Santa Monica, Cal., Michael D. Abzug, Los Angeles, Cal., for defendant/appellant.

Before SNEED, POOLE and FERGUSON, Circuit Judges.

FERGUSON, Circuit Judge:

On May 3, 1983, defendants Barbara Mouzin and Alphonso Carvajal were found guilty on several counts in an indictment that charged them with masterminding and operating a large money-laundering business as an adjunct to an international cocaine trafficking organization. Of the numerous issues raised by the defendants on appeal, we need only discuss the three contentions we find meritorious and one issue on whose merit we cannot agree.

Defendant Mouzin was convicted of nineteen separate offenses including: conspiracy, 18 U.S.C. § 371 (Count One); currency reporting violations, 31 U.S.C. § 1059 (current version at 31 U.S.C. § 5322 (1982)) (Counts Eight through Twelve); the Travel Act, 18 U.S.C. § 1952; conspiracy to violate and substantive violations of the narcotics laws, 21 U.S.C. §§ 841, 843(b), 846; managing a Continuing Criminal Enterprise ("CCE"), 21 U.S.C. § 848 (Count Twenty-Six); and racketeering, 18 U.S.C. § 1962(c). Defendant Alphonso Carvajal was convicted on eight counts of the same indictment alleging that he was a principal, or aided and abetted, in all of the above offenses except the currency reporting and racketeering charges. Defendant Mouzin was sentenced to a total of twenty-five years with a lifetime special parole term. Defendant Carvajal was sentenced to an aggregate of twenty-nine years, also with a lifetime special parole.

Both defendants argue that there was insufficient evidence to convict them and that certain evidence was improperly admitted at trial. Defendant Carvajal also contends that his Sixth Amendment rights were violated by the district court's refusal to notify Carvajal or otherwise to act upon learning of the disbarment of Carvajal's counsel by the Ninth Circuit during the two-month trial. Both defendants contend that their convictions and sentences for the predicate narcotics offenses as they are alleged in their CCE counts must be vacated as lesser-included offenses of the greater CCE offense.

In Parts I, II, and III of this opinion, we find merit in three claims raised by the defendants regarding the sufficiency of the evidence on certain counts and the admission of certain evidence. We are unable to speak with unanimity on defendant Carvajal's Sixth Amendment claim, and Judge Poole writes Section IV for the court with Judge Ferguson in dissent. In Part V of this opinion, we conclude that the imposition of cumulative sentencing for the CCE and predicate narcotics offenses does not violate double jeopardy under the reasoning of *Garrett v. United States*, ‚ U.S. ‚, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

## FACTUAL BACKGROUND

To understand the defendants' arguments on appeal, we find it necessary to

discuss the evidence adduced about the cocaine and money-laundering operation and relate the sequence of some events during the trial.

## A. The Money-Laundering and Cocaine Conspiracy

### 1. Defendant Mouzin's Role

In September 1981 defendant Mouzin approached the president of a small Manhattan Beach bank and inquired whether he would accept large cash deposits (in excess of $10,000) without filing the required currency transaction reports (CTRs). At that time defendant Mouzin was employed as a clothing buyer in a Miami-based garment company known as "Mr. C." According to defendant Mouzin, her employment at Mr. C.'s required her to open accounts for South American clients in order to exchange pesos; her clients allegedly did not want to file CTRs because having accounts in the United States was prohibited by their government. The president of the Manhattan Beach bank, Tom Moore, contacted the IRS and agreed to cooperate in an investigation of Mouzin. Moore then agreed with Mouzin to accept her cash deposits without filing the CTRs in return for a fee.

On November 19, 1981, Barbara Mouzin opened a new account, called the A.E.J. Export account, at the Manhattan Beach bank and deposited $20,000 in the account. The evidence indicates that this money formed the proceeds of a cocaine transaction. By January 1982, defendant Mouzin expressed concern to Mr. Moore that the large number of transactions, totaling more than $5 million, might attract attention in such a small bank. Mr. Moore agreed to facilitate finding a larger bank that would cooperate with the defendant. Mr. Moore then introduced Mouzin to an undercover agent, Ralph Jacoby, who claimed that he had connections with a larger bank through which he laundered money. Jacoby, using "Pan Pacific Financial Management" as an undercover front, agreed to accept cash from Mouzin for deposit in Security Pacific National Bank.

He represented that his connections would ensure that CTRs were not filed.

Defendant Mouzin gave agent Jacoby millions of dollars beginning in February 1982 and ending in June of that year. Pursuant to Mouzin's instructions, sums were disbursed from that account by wire to other banks in Miami and Panama. On many occasions, codefendant Dorothy Hackett, an employee of Mr. C. and an associate of Barbara Mouzin, delivered cash to the Pan Pacific offices. In March 1982, agent Jacoby introduced Mouzin to two DEA undercover agents. These DEA agents, Morgan and Swanson, desired to purchase large quantities of cocaine. According to Mouzin, she first refused to facilitate such transactions but later consented under economic pressure from agent Jacoby to make up for a shortfall from a robbery in the basement of the Pan Pacific Building. At trial, codefendant Hackett, who had previously pled guilty and was awaiting sentence, testified that she picked up the cash for deposit in this account from various sources, including directly from codefendant Carvajal.

On May 27, 1982, defendant Mouzin introduced agents Morgan and Swanson to Alphonso Carvajal at her residence to discuss a large cocaine sale. Carvajal gave Morgan a small sample of cocaine. The agents wanted a larger sample and, as Carvajal was leaving in his car, Swanson requested one kilogram of cocaine. Carvajal told Swanson that he had left something in the house for them. Upon returning to Mouzin's house, the agents purchased approximately two kilograms of cocaine from Mouzin as a sample.

Defendant Mouzin contended at trial that she operated a money-laundering operation which incidentally had a few customers that may have been dealing in cocaine. She claims that her only connection with cocaine transactions, however, was the May 27 introduction of codefendant Carvajal to the agents. She admitted that she knew others, including codefendants Dorothy Hackett and Lois Widdicombe, who

were working for a cocaine dealer not named as a defendant in this case.

## 2. *Defendant Carvajal's Role*

Defendant Alphonso Carvajal was charged primarily with narcotics violations. In addition to the evidence of the May 27 meeting with Agents Morgan and Swanson at the Mouzin residence, the agents testified that they met Carvajal in Miami in June 1982 to purchase cocaine. To pay Carvajal for the May cocaine samples, the agents deposited $57,000 in the Pan Pacific front. At the June meeting, the agents purchased 20 kilograms of cocaine from Carvajal. Carvajal had the cocaine delivered in the trunk of a rental car to the agents who, in return, agreed to deposit $1,000,000 in a Miami account. Upon returning to Los Angeles, the agents displayed fictitious wire transfer records to demonstrate payment to Carvajal. Carvajal then stated that he was part of a large cocaine organization.

## B. *The Trial*

These two defendants were indicted along with twenty other defendants on June 24, 1984. After some pretrial motions, the defendants went to trial on a second superseding indictment alleging twenty-eight separate offenses. At least four codefendants who had previously pled guilty appeared to testify against the defendants. The government introduced as exhibits wiretaps of conversations between the two defendants.

The government also introduced into evidence, over a defense objection, a ledger seized at a codefendant's residence in San Francisco. This ledger, which did not explicitly mention cocaine, was, according to the government, an account book for a large cocaine organization. The ledger was introduced into evidence through the testimony of DEA Agent Lyons, who claimed that he determined that the ledger described, albeit without an explicit reference to cocaine, a massive cocaine operation. Agent Lyons admitted that he had no knowledge of the identity of the ledger's author. The ledger was found at codefendant Costano's residence and did bear his fingerprints. Defense counsel objected to the admission of the ledger and Agent Lyons' testimony on the ground of an inadequate foundation. The government's own handwriting expert could not identify the ledger's author and, beyond the fingerprint, no evidence linked the ledger to codefendant Costano or anyone else. Defendant Carvajal challenges the admission of the ledger as violative of his Sixth Amendment right to confrontation.

The government also introduced a computer printout into evidence, without defense objection. This printout came from a computer disk found during the search of a residence on Trigo Lane in Carlsbad, California. The search, executed on June 29, 1982, netted one pound of cocaine, an Apple personal computer along with a disk marked "Al," a suitcase with a luggage tag for Alphonso Carvajal, and a personal telephone directory listing Carvajal and other alleged cocaine traffickers. IRS Agent Newbrough, who executed the search and made the Apple printout, testified that he saw the name Alphonso when he inserted the disk into the computer although the printout did not display the word Alphonso. Agent Newbrough testified that based on his expert opinion the printout was a numerical running inventory of a cocaine business. Defendant Carvajal challenges the admission of the printout and the interpretive testimony as both hearsay and Confrontation Clause violations.

During the course of the trial, the district court notified defense counsel for defendant Carvajal that the Ninth Circuit had disbarred him. The district court judge informed defense counsel Palacios:

> All I wanted to do was to put on the record that I've discussed this with the Chief Judge of the District Court here, and he believes, like I do, that you should be allowed to complete representation in this case. But I think you are under an obligation to talk to your client about it, to do something about this order, if you think it's not proper, the Ninth Circuit

Order. But if you take a look at Local Rule 1(e)(2) which in effect says if a member of this bar is disbarred by any other Court in which he is admitted, then he automatically is disbarred from practicing in this Court. If you don't want to suffer that disability, it's your obligation to do something about it. But I wanted to inform you that you'd better do something about it if you have proper ground.

Mr. Palacios had been permanently disbarred in an unrelated case for "failing to meet deadlines, prosecute an appeal, and tendering a bad check to a Court Reporter." *United States v. Cortes-Carvajal,* No. 82–1700 (9th Cir. Mar. 15, 1983). Mr. Palacios continued to represent defendant Carvajal through the balance of the district court proceedings. The record is unclear whether defendant Carvajal was informed of his counsel's disbarment; however, at oral argument the government conceded that Carvajal was not informed of the disbarment. As the above discussion reveals, the district court did not personally inform the defendant of this occurrence.

### I.

The Currency and Foreign Transactions Reporting Act ("CFTRA" or "Act"), 31 U.S.C. § 1051 et seq. (1976) (current version at 31 U.S.C. § 5311), was enacted as a subchapter of the Bank Secrecy Act of 1970. The Act imposes a record-keeping and reporting obligation on designated businesses for currency transactions in excess of dollar amounts prescribed by the Secretary of the Treasury. The willful failure to file the required reports with the Treasury Department for transactions in excess of $10,000 is a criminal offense under the Act. *See* 31 U.S.C. §§ 1058–1059 (1976) (current version at 31 U.S.C. § 5322 (1982)); 31 C.F.R. § 103.33(b). By statutory design, however, the reporting obligation for domestic transactions applies only to statutorily defined "financial institutions," 31 U.S.C. § 1052(e) (1976) (current version at 32 U.S.C. § 5312(a)(2) (1982)). The Secretary has also promulgated regulations further defining the term "financial institutions." *See* 31 C.F.R. § 103.11. Counts Eight through Eleven of the indictment charge defendant Mouzin with felony violations of section 1059 for failing to file Currency Transaction Reports ("CTRs") on the receipt of monies during her money-laundering operation. Count Twelve charges her with a felony violation of section 1059 for failure to report a cash delivery to the two undercover agents.

Defendant Mouzin contends that she is not a "financial institution" within the meaning of either the CFTRA, 31 U.S.C. § 1052(e) (1976) (current version at 31 U.S.C. § 5312(a)(2) (1982)), or its implementing regulations, *see* 31 C.F.R. § 103.-11. If the defendant is not a "financial institution," she has no reporting obligation for domestic transactions. Mouzin also contends that even if she falls within the regulation's definition of "financial institution," this regulatory definition impermissibly exceeds the bounds of the Act's definition of financial institution. *Cf.* 5 U.S.C. § 706(2)(C). Assuming that she is appropriately considered a "financial institution," Mouzin further argues that she qualifies as a "nonbank financial institution" under the regulations. The regulations exempt from the reporting requirements all transactions between nonbank financial institutions and commercial banks.[1] 31 C.F.R. § 103.22(b)(1)(iii). The defendant also challenges the sufficiency of the evidence on her five felony currency counts. Finally, the defendant takes exception to the imposition of five felony convictions, rather than one.

In response, the government argues that defendant Mouzin qualifies as a "financial institution" under the Act and the regulations promulgated thereunder. The government admits that the defendant, as an individual, constitutes a "nonbank financial institution" under the regulations. The government denies that the defendant is thereby exempt from reporting the

---

1. According to the government, nonbank financial institutions are exempt from reporting these transactions because the commercial bank will assume the reporting obligation.

charged transactions, however, because these transactions did not involve a commercial bank, as required by the regulations. *See* 31 C.F.R. § 103.33(b)(1)(iii). The government also rejects the defendant's arguments regarding the number of counts the defendant should be charged with under 31 U.S.C. § 1059. *See United States v. Kattan-Kassin,* 696 F.2d 893, 895–96 (11th Cir.1983) (construing § 1059); *see also United States v. So,* 755 F.2d 1350, 1354–55 (9th Cir.1985) (construing § 5322). Finally, the government asserts that the evidence was sufficient on all five of the defendant's currency reporting convictions.

Defendant Mouzin contends that she is not a "financial institution" within the meaning of the CFTRA. The Act defines the term to include various types of legitimate banking and business entities. *See* 31 U.S.C. § 1052(e) (1976) (current version at 31 U.S.C. § 5312(a)(2) (1982)). The Secretary is also empowered to promulgate regulations defining a "financial institution" as any "type of business or institution performing similar, related, or substitute functions" to those listed in the Act. 31 U.S.C. § 1052(e)(21) (current version at 31 U.S.C. § 5312(a)(2)(U) (1982) ("another business or agency" performing similar duties)). By regulation, the Secretary has defined the term "financial institution" to include a "person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks" and a "person engaged in the business of transmitting funds abroad." 31 C.F.R. § 103.11. Mouzin argues that the Act limits the reporting obligation to financial institutions which are legitimate financial entities.

The defendant is correct in asserting that the Act only lists legitimate commercial enterprises in its definition of "financial institutions." In enacting the statutory definition of "financial institution," the Nine-

ty-First Congress clearly directed the reporting obligation to legitimate commercial institutions. *See* H.R.Rep. No. 91–975, 91st Cong.2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad.News 4394, 4404–05 (CFTRA intended to thwart diversion of cash to foreign secrecy jurisdictions; facilitate supervision of financial institutions subject to federal supervision; aid law enforcement; and, provide statistics for monetary and economic policy. Secretary authorized "to require any class of domestic financial institutions to maintain appropriate procedures ... [because] where a financial institution fails to properly train or supervise its employees, recurrent violations can be expected."). The Act lists various legitimate commercial enterprises as financial institutions, for example, currency exchanges, travel agencies, pawnbrokers, and insurance companies. The Act also makes clear that a single individual conducting these activities may indeed constitute a financial institution. *See* 31 U.S.C. § 1052(e) (1976) (current version at 31 U.S.C. § 5312(a)(2) (1982)).[2]

The Treasury regulation that expands upon the statutory definition for "financial institutions" retains the requirement that the "financial institution" be engaged in an ongoing "business." 31 C.F.R. § 103.11. This is consistent with the intent of Congress to facilitate the supervision of domestic businesses engaged in substantial transactions in currency or monetary instruments. Significantly, Congress did not intend to delegate to the Treasury Department unfettered discretion to define those institutions upon which the reporting obligations will fall. *See* 116 Cong.Rec. 16960 (statement of Rep. Reuss) (describing limited delegation to Secretary). A broad regulatory interpretation of what constitutes a "financial institution" may sweep innocuous currency transfers between private citizens into the realm of the currency laws. Such a result was not the intent of the Ninety-First Congress. Nonetheless,

---

2. *See* 31 U.S.C.A. § 5312 explanatory notes (explaining that 1982 revision struck "person who does business" as surplus).

by retaining the legitimate business characteristic for the statutory term "financial institution," the regulations do not extend the statutory definition beyond the expressed intent of Congress. *Cf.* 5 U.S.C. § 706(2)(C).

■ It is apparent that the conduct of defendant Mouzin qualified her as a "financial institution" under the Act. Defendant Mouzin has admitted that she was, at a minimum, engaged in transferring currency between Colombia and the United States as well as among the states in an ostensibly legitimate business venture. She certainly was aware of the reporting requirements. Hence, on the facts of this case, the defendant was a financial institution under the Act and the implementing regulations.

■ We also reject defendant Mouzin's further contention that she was exempt from reporting her transactions as a "nonbank financial institution." Although the government agrees that the defendant is a "nonbank financial institution," it denies that her transactions fall within the regulatory exemption for nonbank "transactions with commercial banks." 31 C.F.R. § 103.-22(b)(1)(iii). No commercial bank was involved with the defendant's receipt of currency as alleged in Counts Eight through Eleven. Similarly, Count Twelve, which charges the defendant with depositing $500,000 with the two undercover agents posing as Pan Pacific Financial Management, does not directly involve a transfer between the defendant and a commercial bank. We find no evidence to support the defendant's further contention that these officers were acting as agents of a commercial bank. Thus, defendant Mouzin did not fall within the regulatory exemption for nonbank financial institutions.

■ Defendant Mouzin's final argument as to her currency reporting convictions questions the sufficiency of the evidence on each count. We view the evidence in the light most favorable to the government to determine whether any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Marabelles,* 724 F.2d 1374, 1377 (9th Cir.1984). The evidence was sufficient as to Count Twelve, which alleged that the defendant engaged in a reportable currency transaction in the form of a delivery of monies to the undercover agents. One of the agents testified to the delivery of the alleged sum by the defendant. Conversely, we find the evidence on the four remaining currency counts, those alleging the defendant's failure to report the receipt of currency, was insufficient.

Counts Eight through Eleven charged the defendant with the receipt of a reportable currency transaction. The regulations define a currency transaction as a "transaction involving the physical transfer of currency from one person to another." 31 C.F.R. § 103.11. The regulations further clarify that a financial institution has fifteen days from the date of the currency transaction to file a report. *Id.* § 103.25(a). The physical transfer of the currency, therefore, is the operative event giving rise to the reporting obligation. To prove a willful failure to report, therefore, the government must produce evidence of a physical "transaction in currency." *Id.* § 103.11. In other words, where the government charges a reporting violation by a financial institution for the receipt or delivery of "currency," as that term is defined, *Id.* § 103.11, the government must present evidence of the physical transfer of the currency. *See id.* § 103.22(a) (describing reportable incident). The physical transfer is the act triggering the fifteen-day period in which to file a report.

■ We have reviewed the evidence presented by the government on the four "receipt" counts of the indictment (Counts Eight through Eleven) and find the evidence insufficient to sustain the defendant's convictions. At trial, the government presented two sets of evidence to substantiate these charges: as to Counts Eight and Nine, the testimony of the undercover agents as to codefendant Hackett's delivery of monies and, regarding Counts Ten

and Eleven, notations in the Costano ledger. The testimony of the agents regarding delivery of sums by codefendant Hackett, however, do not establish the time or terms of a prior reportable receipt of currency by defendant Mouzin. The government produced no evidence of a prior physical transfer of currency sufficient to require Mouzin, as a financial institution, to file a CTR. As to Count Ten and Count Eleven, however, the government presented an improperly admitted ledger as proof that codefendant Hackett picked up sums of money for eventual deposit on two occasions. We need not examine whether this evidence, standing alone, would be sufficient to demonstrate a prior physical transfer. As discussed in Section II, the admission of this ledger without a proper foundation as the statement of a co-conspirator was error.

## II.

The defendants contend that the district court erred in admitting two exhibits along with the accompanying interpretive testimony of government agents. The first exhibit, a ledger obtained from a codefendant's residence allegedly detailing a cocaine business, was admitted over a defense objection to the foundation laid by the government. The second exhibit, admitted without defense objection, was a computer printout from a personal computer found during the search of a home. Although the admission of both exhibits presents similar evidentiary issues, we will discuss each separately.

### A. *The Ledger*

During the trial, the government placed in evidence a ledger found at the San Francisco residence of co-conspirator Costano. This ledger, written in Spanish, did not contain any explicit references to cocaine. The ledger did not mention the name of anyone that the government was able to identify at trial. The authorship of the ledger entries was never established at trial. The government's handwriting expert could not positively link the entries in the

ledger to handwriting obtained from co-conspirator Costano.

The government introduced the ledger through the testimony of DEA Agent Lyons. Agent Lyons testified that, in his expert opinion, the ledger was a record of a large international cocaine operation. Lyons admitted, however, that he did not have any personal knowledge regarding the transactions allegedly chronicled in the ledger, nor could he identify any of the individuals named in the ledger entries. The government asserted that the ledger was admissible under the co-conspirator exception to the hearsay rule because it was found at the Costano residence and contained Costano's fingerprints.

The government urged that the ledger was relevant to Count One, the conspiracy count, and suggested that some entries could be corroborated by the testimony of other conspirators about the dates of various of the cash transactions. Defense counsel objected as to foundation and noted that many of the fingerprints, including those of defense counsel, were also found on the ledger. The defendants did not admit authorship of the ledger entries.

In *United States v. Ordonez*, 737 F.2d 793 (9th Cir.1984), on identical facts, we reversed a defendant's cocaine conspiracy conviction because of the improper and prejudicial admission of a similarly unascribed ledger. In *Ordonez*, DEA Agent Lyons offered similar interpretive testimony about the content of a ledger entered into evidence without defense objection to the sufficiency of the foundational facts to satisfy the Confrontation Clause. Even though the defendant had not entered this objection to the admission of the ledger, the *Ordonez* opinion held that its admission without a proper foundation was both plain and prejudicial error, violating the defendant's confrontation rights under the Sixth Amendment. *Id.* at 805–07. The primary reason for our confrontation decision rested on the absence of any foundational proof by the government as to the authorship of the ledger entries. *Id.* at 800–05.

In reaching its conclusion, the *Ordonez* opinion rejected the government's argument that possession of a document is tantamount to an adoption of its contents under Rule 801(d)(2)(B) of the Federal Rules of Evidence. *Id.* at 800–01. As appellate judges we are acutely aware of the difference between the mere possession of a document and an adoption of its contents. The *Ordonez* opinion declined to consider the government's argument, raised initially on appeal, that the ledger was not hearsay under Federal Rule of Evidence 801(d)(2)(E). Nevertheless, the *Ordonez* opinion concluded that the admission of the unascribed ledger violated the defendant's confrontation rights. In an attempt to distinguish this case from the facts of *Ordonez*, the government contends that the ledger is admissible under Rule 801(d)(2)(E). Having reviewed the government's efforts to lay a foundation for the admission of the ledger during the trial, we agree with the defendant that its admission was error.

 In order to be admissible under Rule 801(d)(2)(E), a statement [3] by a co-conspirator must be made in the course of and in furtherance of a conspiracy. *Ordonez*, 737 F.2d at 801; Fed.R.Evid. 801(d)(2)(E) advisory committee note. Accordingly, there are three separate inquiries a court must undertake before admitting the alleged statement of a co-conspirator into evidence under Rule 801(d)(2)(E). First, the court must find "independent proof of the existence of the conspiracy." *United States v. Snow*, 521 F.2d 730, 733 (9th Cir.1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). Second, the court must find that the proposed statement was made "in furtherance" of the objectives of the conspiracy. *United States v. O'Connor*, 737 F.2d 814, 820 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985); *United States v. Traylor*, 656 F.2d 1326, 1332–33 (9th Cir.1981) (idle conversation insufficient). Finally, the court must find as a preliminary matter that the proferred

statement was made during the course of the conspiracy. *Ordonez*, 737 F.2d at 801. A necessary corollary to the above three preconditions for admission is that there must also be independent proof "of the connection of the declarant and the defendant to" the conspiracy. *Snow*, 521 F.2d at 733. Again, this is merely a restatement of the requirement that before a statement is that of a "co-conspirator" there must be independent proof of the defendant's and the declarant's status as members of the same ongoing conspiracy. In order to corroborate or refute this status, the litigants must know the identity of the declarant.

 Against these minimum criteria for a proper foundation under Rule 801(d)(2)(E) we place the government's proffered foundation for the ledger. Authorship of the ledger entries was never established and therefore we have no knowledge of the declarant's identity. The only evidence even remotely connecting any co-conspirator to the ledger was the fingerprints of co-conspirator Costano. Other fingerprints, including those of defense counsel, were found on the ledger. The government stipulated that its handwriting expert, after examining handwriting exemplars, was unable to identify Costano as the author of the ledger entries. The ledger's only other link to co-conspirator Costano was the presence of the ledger in Costano's residence. This circuit has previously held that mere possession does not constitute an adoptive admission. *Ordonez*, 737 F.2d at 800–01. Consequently, the document's presence at Costano's residence, even assuming that the government could thereby establish possession, does not constitute an adoption of its contents by Costano.

 The government's failure to identify the author or authors of the ledger entries rendered the ledger inadmissible under Rule 801(d)(2)(E) for a lack of proper foundation. Knowledge of the identity of the declarant is essential to a determination that the declarant is a conspirator whose statements are integral to the activities of

---

**3.** Fed.R.Evid. 801 defines statements as including both written and oral assertions.

the alleged conspiracy. Of course, identification of the declarant will not, by itself, establish a proper foundation unless the identified declarant is a co-conspirator whose assertions were made in furtherance of and in the course of the conspiracy. Finally, we reject the government's suggestion of equating the foundational requirements for Rule 801(d)(2)(E) with the standards for authentication under Federal Rule of Evidence 901. *See* Fed.R.Evid. 901(b) advisory committee note ("It should be observed that compliance with requirements of authentication or identification by no means assures admission of an item into evidence, as other bars, hearsay for example, may remain."). Rule 801(d)(2)(E) posits a separate foundational threshold that must be satisfied before a declarant's hearsay statement becomes admissible.

## B. *The Computer Printout*

■ The computer printout admitted into evidence at trial did not have any distinguishing features other than the name "Al" on the disk and the testimony of Agent Newbrough that the name "Alphonso" was displayed on the screen prior to the printout. In reviewing the government's foundation for the admission of this evidence under Federal Rule of Evidence 801(d)(2)(E), we cannot but note the similarities between the foundational deficiencies for the ledger and for the computer printout. Nonetheless, there are significant differences between the two mediums, a ledger and a computer disc, that may warrant different treatment. The government did not, and presumably could not, offer any handwriting or other expert testimony to establish the identity of the printout's author based solely on an examination of the printout. There may exist other means by which the author or authors of the printed material could be identified. We need not, and, on this record, cannot, examine the minimal foundational requirements for the admission of nonbusiness computer-generated statements under Rule 801(d)(2)(E). The government's foundation to the printout was never challenged by the defendants and our review is confined to plain error. Even on this sparse record, however, we must follow our opinion in *Ordonez*, 737 F.2d at 799, and find plain error based on the government's failure to comply with the Confrontation Clause. The only remaining inquiry is whether the error is harmless. Fed.R.Crim.P. 52(a); *see also Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Although the government contends that the ledger and printout were admitted only to corroborate the general conspiracy, 18 U.S.C. § 371, charges in Count One, the government itself has referred to the ledger in support of the sufficiency of the evidence on the currency report violations in Counts Ten and Eleven. We agree with the government that the admissible evidence on Count One was so overwhelming that the admission of the ledger and printout must be considered harmless as to that conviction. Nonetheless, given the dearth of evidence on Counts Ten and Eleven, we find the improper admission of the ledger and printout to be prejudicial error. Fed.R.Crim.P. 52(a) (harmless error standard applicable to ledger); *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828 (harmless error standard applicable to constitutional error re printout). Accordingly, we reverse the defendant's convictions on these two counts based on the improper admission of the ledger and computer printout.

## III.

■ Both defendants raise several challenges to their convictions under the Travel Act, 18 U.S.C. § 1952. *See generally Project, White Collar Crime: Third Annual Survey of Law*, 22 Am.Crim.L.Rev. 279, 353, 354–65 (1984) (describing Travel Act elements). We find merit in only one contention, raised by .defendant Mouzin, and accordingly reverse her conviction on Count Thirteen for insufficient evidence. Count Thirteen alleged that the defendant traveled from Miami to Los Angeles to distribute the proceeds of and otherwise to manage a cocaine organization. The evi-

dence produced at trial reveals that the defendant arrived with codefendant Cantelli at the Manhattan Beach bank "carrying garment bags and suitcases" when they deposited $530,000 in the bank. Codefendant Cantelli mentioned to bank officer Moore that he was the defendant's partner in Miami and he had been talked into "coming down" to Los Angeles. We agree that no reasonable juror could infer the requisite element of interstate travel based solely on the presence of garment bags.

## IV.

Written by Circuit Judge POOLE with Circuit Judge FERGUSON dissenting.

Carvajal claims that he was denied effective assistance of counsel because, while the trial was going on, his counsel, Palacios, was disbarred from practicing before this court of appeals for conduct not related to this case, and because that fact was not disclosed to him until the trial was over. He argues for a per se rule that if a lawyer is disbarred during a trial the client must be told; that otherwise the trial cannot proceed, and any further attempted professional services by the lawyer must be deemed legally ineffective under the Sixth Amendment to the United States Constitution. Carvajal also complains that since it was the trial judge who learned of the disbarment and conveyed that information to the lawyer, the judge should personally have told him, the client, of that event and should have halted the trial unless the client knowingly waived his right to "effective representation" of counsel. Alternatively, Carvajal argues that in failing to tell him about Palacios' problem, the judge fostered a conflict of interest between lawyer and client because he put the lawyer to the embarrassing burden of disclosing to his client that he had been adjudged to have committed unprofessional conduct.

Palacios continued to act as Carvajal's lawyer to the end of trial, and the record is not clear exactly when Carvajal learned of the order of disbarment. For discussion purposes, we will assume that Carvajal did not get the information until the trial had concluded.

## A. Whether Counsel Was Automatically Disqualified from Further Participation.

As we have said above, by the order of the Ninth Circuit, Palacios was disbarred from practicing before this court because of his conduct in unrelated cases "unbecoming a member of the bar of the court" and "failure to comply with * * * rules * * of the court." Fed.R.App.P. 46(b) and (c). The conduct involved failure to meet deadlines in pending appeals, failure to prosecute an appeal, and giving an insufficient check in payment for court reporter services. The effect such an adjudication in this court will have upon a lawyer's status in a district court will depend upon the rules of the latter court. We therefore must turn to the practice and rules of the district court in which the trial was pending.

Local Rule 2.6.2 of the United States District Court for the Central District of California provides:

Upon receipt of reliable information that a member of the bar of this court has been suspended or disbarred from practice by the order of any court or administrative agency, this court shall immediately impose a like order of suspension or disbarment. The attorney so suspended may make application to the Chief Judge for reinstatement by regularly noticed motion.

Central District Local Rule 2.6.4 further establishes a procedure for referral of charges which have not yet been adjudicated by a court or administrative agency to a three-judge panel. That panel will conduct a hearing upon notice and the lawyer will have an opportunity to appear and be heard. This rule contemplates a different situation and does not on its face resolve the problem here.

In this case, the trial judge, after receiving notice of the order disbarring Palacios from practicing before the Ninth Circuit, conferred with the Chief Judge of the district court. Their consensus was that the

trial ought not be halted. The district judge then discussed the disbarment order with Palacios and urged him to take it up with his client. The record discloses no indication of an intent by either judge or counsel to suspend the trial; nor does it show that the matter was ever revealed to counsel for the co-defendant.

■■■ Read literally, Rule 2.6.2 would seem to call for the immediate entry of a "like order" disbarring Palacios from practicing in the Central District. Yet neither the trial judge nor the Chief Judge accorded such significance to the rule, apparently not viewing its requirement as immediate. The announcement of a disbarment order may come at many different stages of a trial court proceeding and may produce consequences of major or only minor nature. The rule has a salutary purpose but obviously an automatic and immediate implementation could in many situations bring about litigation disaster. How, when, and under what circumstances such implementation should be accomplished would seem best left to the sound discretion of the court which promulgated it and the judges who must enforce it. We are therefore constrained to defer to the district court's reading to the extent that such a construction does not involve conflict with an order of this court, the Federal Rules of Civil Procedure, case or statutory law, or the Constitution of the United States. We see no such conflict. On the contrary, the record shows an ongoing jury trial of two defendants who were charged with multiple and very serious criminal offenses which was in its closing stages; that the effect of receipt of the appellate court's order confronted the court with a crucial decision whether to plunge the trial into chaos by the abrupt and sudden disqualification of the counsel for one of the defendants. Resolution of that problem required weighing conflicting rights of fair trial, speedy trial, depriving a party of counsel of his own selection, and thorny questions of double jeopardy. *See, e.g., Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978) (sua sponte declaration of mistrial without a showing of "manifest necessity" therefor may trigger bar of double jeopardy). Faced with these alternatives, the trial court concluded that exigent circumstances justified postponing the immediate entry of a local disbarment order. This was not the usual situation in which the local rule could be applied easily and without serious disruption of the judicial process. The court had realistically a choice only between the Scylla of going ahead with trial, or the Charybdis of throwing the case into confusion and disarray. We find its decision reasonable and valid.

Some parallel to the trial court's dilemma can be found in many cases where, during trial, an attorney, by design, excess of zeal, or other reason, engages in serious contumacious or provocative conduct. A trial judge contemplates sanctions; but, weighing the length of trial already expended, the difficulty of marshaling witnesses and evidence for a second trial, the interest of a defendant in a trial in which his rights are accorded, and the public's interest in fair, but also prompt and just, resolution of the issue, the judge will often elect to stay his sanction and let the trial come to orderly conclusion, rather than risk or declare a mistrial. *See, e.g., United States v. Altamirano*, 633 F.2d 147 (9th Cir.1980), *cert. denied*, 454 U.S. 839, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981).

We conclude that the district court was not required by its Local Rule 2.6.2 immediately and automatically to enter an order disbarring counsel and disqualifying him from further participation in the trial.

This is not to say that Palacios ought not to have shared the information with his client, who then could have been heard as to his views. But we do conclude that neither the ends of justice nor Local Rule 2.6.2 of the Central District of California required the court immediately and automatically to enter an order disbarring Palacios and disqualifying him from further participation, even though Palacios disregarded the judge's direction that Carvajal be told the unanticipated turn of events.

### B. Whether Disbarment Rendered Counsel's Services Ineffective.

Even if we had concluded that under its local rules the district court in this case should have entered a "like order" pursuant to Local Rule 2.6.2, we would reject the argument that disbarment by the circuit court turned Palacios' continued services in Carvajal's behalf ineffective under the Sixth Amendment.

■ Disbarment is a punishment or penalty imposed upon a lawyer, who is accordingly entitled to procedural due process for himself before imposition of sanction, *In re Ruffalo*, 390 U.S. 544, 547, 88 S.Ct. 1222, 1224, 20 L.Ed.2d 117 *modified*, 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1380 (1968), and who is further still under obligation—if it is legally possible—to protect his client's interests against the indictment with which he is still charged.

> Though admission to practice before a federal court is derivative from membership in a state bar, disbarment by the State does not result in automatic disbarment by the federal court.

*Id.* at 547, 88 S.Ct. at 1224. "Disbarment being the very serious business that it is, ample opportunity must be afforded to show cause why an accused practitioner should not be disbarred." *Theard v. United States*, 354 U.S. 278, 282, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957). Ample precedent supports the position that Palacios was not automatically disqualified, and that his subsequent services would not, without regard to their intrinsic quality, be deemed "ineffective."

In *United States v. Hoffman*, 733 F.2d 596 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984), Hoffman's lawyer, Vernell, a licensed member of the Florida bar, was, *during* a trial in the district court of Arizona, suspended by Florida from the practice of law for a period of six months, having suffered misdemeanor convictions for failure to file income tax returns, and because he had counseled two clients to enter guilty pleas and then to challenge their pleas as void due to his conflict of interest in representing

them. A local rule for the District of Arizona required an attorney subject to disciplinary action by the bar of another jurisdiction to report that matter to the court. Another rule provided that, upon suspension or disbarment by any court of competent jurisdiction, such attorney would be "forthwith suspended from practice before this court, and [unless upon good cause shown within 40 days], he will be disbarred." D.Ariz.R. 7(c).

Vernell did not inform the court of his disbarment during the trial, and the Arizona district court did not order him disbarred from that forum until a month after his client Hoffman had been sentenced. In a post-judgment petition for relief under 28 U.S.C. § 2255, Hoffman argued that upon his Florida disbarment, Vernell was no longer "counsel" within the meaning of the Sixth Amendment, that the trial judge would have been obligated to suspend him immediately had he known of the Florida suspension, and that he should be deemed to have been disqualified from the time of his Florida suspension. We rejected that argument.

We began in *Hoffman* by noting that the Sixth Amendment guarantee of counsel means assistance by an attorney who has been found qualified to represent a client as evidenced by admission to the bar. *Id.* at 599. But we refused to apply a per se rule that in the federal court, representation by a lawyer suspended from practice by a state bar automatically results in the denial of the Sixth Amendment right to counsel. *Id.* at 601. A defendant must show actual errors and omissions by counsel that a conscientious advocate would not have made, and which prejudiced him. *Id.* at 603.

■ Vernell was in fact reinstated the following year, long after sentence and judgment, but that does not affect the application of the same principle here. *Hoffman* teaches that the fact that an attorney is suspended or disbarred does not, without more, rise to the constitutional significance of ineffective counsel under the Sixth

Amendment. Rather, a defendant must ordinarily point to specific conduct which prejudiced him in order to raise the constitutional claim. To constitute ineffective representation by counsel

> Defense counsel's errors or omissions must reflect a failure to exercise the skill, judgment, or diligence of a reasonably competent criminal defense attorney—they must be errors a reasonably competent attorney acting as a diligent conscientious advocate would not have made, for that is the constitutional standard.

*Cooper v. Fitzharris,* 586 F.2d 1325, 1330 (9th Cir.1978) (*en banc*) (footnote omitted), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). *See also United States v. Butler,* 504 F.2d 220, 223 (D.C. Cir.1974) (per curiam) (that counsel was not a member of the local bar was not alone sufficient to find the right to effective counsel breached; but significant trial errors and other prejudicial considerations, in addition to nonmembership, warranted remand). The majority in *Hoffman* therefore rejected the view that a presumption of ineffectiveness arises in the trial forum when a lawyer is suspended from practice by his bar state. 733 F.2d at 603–04 (Nelson, J., dissenting).

Our rejection of a per se rule in *Hoffman* was not unprecedented. In analogous situations, other courts have rejected similar per se rules. For example, the Supreme Court rejected the proposition that disbarment in a state results in automatic disbarment in federal court. *Ruffalo,* 390 U.S. at 547, 88 S.Ct. at 1224; *Theard,* 354 U.S. at 281–82, 77 S.Ct. at 1276. Disciplinary orders affecting an attorney's bar status do not warrant the application of per se rules. *United States v. Bradford,* 238 F.2d 395 (2d Cir.1956), *cert. denied,* 352 U.S. 1002, 77 S.Ct. 558, 1 L.Ed.2d 546 (1957) (right to counsel not violated where defendant was represented in federal court by member of New York bar who had not applied for admission to practice in the federal bar); *accord, Derringer v. United States,* 441 F.2d 1140, 1141 (8th Cir.1971) (per curiam) (representation by counsel who was member of state bar but not admitted to federal district court did not deprive defendant of effective assistance of counsel).

A defendant's right to effective assistance of counsel would be violated where he is represented by a person posing as a lawyer who had not been admitted to any bar. *E.g., Solina v. United States,* 709 F.2d 160, 169 (2d Cir.1983) (reversing denial of defendants' motion to vacate conviction where his attorney was a graduate of accredited law school who twice failed New York bar examination and who had never been admitted to any other bar); *Harrison v. United States,* 387 F.2d 203, 212–14 (D.C.Cir.1967) (conviction reversed because government used defendant's statements from earlier trial in which defendant was represented by ex-convict posing as a lawyer), *rev'd on other grounds,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). The principle applied in such cases is that one never admitted to practice law and therefore who never acquired the threshold qualification to represent a client in court cannot be allowed to do so, and no matter how spectacular a performance may ensue, it will not constitute "effective representation of counsel" for purposes of the Sixth Amendment. Conversely, the infliction of discipline upon an attorney previously qualified and in good standing will not and should not transform his services into ineffective assistance.

In a somewhat analogous situation, a decision of the Seventh Circuit is informative. In *United States v. Merritt,* 528 F.2d 650 (7th Cir.1976), (per curiam) counsel appointed to represent a defendant in an Indiana trial had passed the Iowa bar examination but, unknown to the court, had failed the Indiana examination three times (and therefore was ineligible for a retake until completion of an additional year of study). He had apparently had no prior trial experience. On appeal the defendant claimed ineffective assistance of counsel. The Seventh Circuit said:

> [t]he bar examination failures and the inexperience of appointed counsel create

an appearance of inadequate representation that is compounded by the cumulative effect of several incidents which provide reasonable grounds for questioning counsel's professional judgment and skill. Standing alone none of these incidents would lead us to conclude that counsel had not met "a minimum standard of professional representation." Under all the circumstances of this case, however, we think that standard was not met.

*Id.* at 651 (citation omitted). In other words, since the attorney had met the qualifications of a sister state, it could not be said, without looking to the trial record, whether, although not a member of the Indiana bar, he did or did not possess the "minimum standard" to represent a defendant in court. In *Hoffman* we also looked to see whether counsel, despite the Florida suspension, met our requirement of "reasonably competent criminal defense attorney." *Hoffman*, 733 F.2d at 603.

We adhere to our stated standard. Neither suspension nor disbarment invites a per se rule that continued representation in an ongoing trial is constitutionally ineffective. Admission to the bar allows us to assume that counsel has the training, knowledge, and ability to represent a client who has chosen him. Continued licensure normally gives a reliable signal to the public that the licensee is what he purports to be—an attorney qualified to advise and represent a client. But it is an undeniable fact of experience that lawyers unhappily incur sanctions ranging from censure to disbarment; that sometimes that discipline flows from revealed incompetence or untrustworthiness or turpitude such as to deserve no client's confidence. All we need hold here is that a lawyer's services were ineffective on a case, not a per se, basis.

Indeed, Carvajal does not contend, and the record does not show, that the conduct which provoked our order was such as reasonably could be said to have affected or impaired his trial performance. The only suggestion of shortcoming presented by Palacios appears in his failure to communicate the fact of disbarment to the client and to discuss the implications, if any, that might ensue. Carvajal argues the existence of some linkage between the failure to advise him of the disbarment and Palacios' failure to submit a timely motion on double jeopardy grounds. But there is no explanation of how the omission to submit the motion was, on the record of this case, such an omission as a reasonably competent attorney would not have made, or how the omission prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064–68, 80 L.Ed.2d 674 (1984) (to make successful claim, a defendant must show that counsel's performance fell below objective standard of reasonableness, identifying such with particularity, and must show prejudice—that but for counsel's errors, the result would have been different).

We therefore hold that the disbarment of Palacios during trial did not violate Carvajal's Sixth Amendment right to effective assistance of counsel. Palacios retained the ability to render effective assistance of counsel to Carvajal at trial, and the record does not show his failure to do so despite his disbarment.

Our holding that Carvajal was not denied effective assistance of counsel is not changed by Carvajal's argument that the district judge was obligated to inform him directly of Palacios' disbarment and to obtain a waiver of Carvajal's right to "effective" counsel. Obviously, full disclosure to the client by counsel of such a happening during trial would make sense and could have settled this entire issue. The district judge recognized this, stating to Palacios, "I think you are under obligation to talk to your client about [the disbarment]."

Carvajal's position is that the trial had to be halted unless he knowingly waived his right to proceed with the same counsel or without counsel. We do understand a trial judge's reluctance to terminate the entire trial, or to wait for a new attorney to familiarize himself with defendant's case. In such a situation, caution, as well as the judge's concern for protection of all those before the court, should prompt the court

to make certain that a defendant be informed of so significant a matter which might affect the person's interests. The district judge urged counsel himself to tell his client. Had he followed through, lawyer and client could possibly have settled all questions between them. But the omission to do so does not constitute grounds for disturbing the conviction.

 We also reject the argument that by not informing him of Palacios' disbarment, the trial judge created a conflict of interest between him and counsel. We rejected an analogous argument in *Hoffman* where the defendant claimed counsel's failure to inform the court of his Florida suspension put the two in conflict. 733 F.2d at 601. Instead, we adopted the standard set forth by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), for determining when a lawyer's conflict of interest violates his client's right to counsel. A defendant must demonstrate "that his counsel actively represented conflicting interests." *Id.* at 350, 100 S.Ct. at 1719. In *Hoffman,* we concluded that the defendant failed to show an actual conflict that adversely affected his counsel's performance. 733 F.2d at 602.

The same is true here. There is nothing to indicate that Palacios was so affected by his personal adversity that he was thereafter beset with conflicting interests prejudicial to the conduct of Carvajal's trial, or that he was placed in an adversarial position relative to Carvajal. *Cf. id.* Moreover, it was the district judge who informed Palacios of his disbarment. There was no fraud on the court, and this is not a case where a layman posing as an attorney may risk fear of exposure, as in *Solina,* 709 F.2d at 164. The concern in *Solina* that a layman posing as an attorney might fear that vigorous representation could lead to inquiry into his background and discovery of his lack of credentials is not present here. *See also United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984) (per se rule that right to effective assistance of counsel violated where, unknown to

defendant, trial counsel engaged in activity related to conduct for which defendant was convicted). Nor does this case resemble *United States v. DeFalco,* 644 F.2d 132, 133 (3d Cir.1979) (en banc) (defendant may have been denied effective assistance of counsel absent waiver, if he was unaware that his attorney, while representing him on appeal, was under indictment and had accepted a plea bargain in the same federal district court.)

Carvajal suggests that Palacios may have feared "additional disciplinary censorship from the district court," and that this might have prevented him "from competing vigorously with the government before the trial court" on Carvajal's behalf. But the district judge informed Palacios that he had discussed the disbarment with the Chief Judge of the district court, and that both judges agreed to allow Palacios to complete his representation of Carvajal. Thus, under these facts we fail to see "any constraint on counsel's complete and exuberant presentation." *DeFalco,* 644 F.2d at 136. Carvajal's conflict of interest argument is wholly speculative. Neither representation by counsel disbarred during trial, the district judge's failure to inform Carvajal of the disbarment, nor the court's disclosure of the disbarment to Palacios but not Carvajal denied Carvajal the effective assistance of counsel.

### V.

 The defendants' final argument concerns the propriety of their cumulative sentences on the CCE counts and the substantive predicate narcotics offenses. Both defendants argue that their convictions on predicate narcotics offenses that form the basis for their section 848 convictions are lesser-included offenses. Relying on *Brown v. Ohio*, 432 U.S. 161, 164–70, 97 S.Ct. 2221, 2224–27, 53 L.Ed.2d 187 (1977), and *Jeffers v. United States,* 432 U.S. 137, 150, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977), the defendants argue that their conviction on the greater CCE offense requires this court to vacate both their convictions and sentences on the lesser-includ-

ed predicate narcotics offenses. The Supreme Court's most recent pronouncement on the relationship between the CCE offense and the charged substantive predicate narcotics offenses, counsels against the defendants' interpretation of these two cases.

In *Garrett v. United States*, —— U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), the Supreme Court construed the CCE offense as constituting an offense separate from the predicate narcotics offenses. Similarly, the Court interpreted the intent of the Ninety-First Congress as desiring the imposition of cumulative punishment for the CCE and predicate offenses. Accordingly, we affirm the district court's imposition of cumulative sentences on the defendants' separate convictions for violating section 848 and the separate substantive narcotics violations contained in the indictment.

## CONCLUSION

We AFFIRM the defendants' convictions on all counts except for defendant Mouzin's convictions on Counts Eight, Nine, Ten, Eleven, and Thirteen. As to those counts, we REVERSE Counts Eight, Nine, and Thirteen for insufficiency of the evidence and Counts Ten and Eleven for the prejudicial introduction of inadmissible hearsay.

FERGUSON, Circuit Judge, dissenting from Part IV:

I would reverse Carvajal's conviction because his right to Due Process and right to counsel were violated. When a district court and a criminal defense attorney have an *in camera* discussion about the attorney's disbarment and its effect on his continued representation of the defendant, I believe that the defendant has the right to be informed and present. A criminal defendant's constitutional right to be informed that his or her attorney has been disbarred from the trial court in which the prosecution is pending and the court to which any appeal would be made greatly outweighs the majority's concerns of judicial convenience. I must therefore dissent.

## I.

On March 15, 1983, this circuit permanently disbarred Carvajal's attorney, Victor Palacios, for failing to meet deadlines in pending appeals, failing to prosecute an appeal, and writing a bad check to a court reporter. *United States v. Cortes-Carvajal*, No. 82–1700 (9th Cir. Mar. 15, 1983). Rule 2.6.2 of the Local Rules for the United States District Court for the Central District of California provides that the district court "shall immediately impose a like order" disbarring an attorney on receiving reliable information that another court or any administrative agency has disbarred the attorney. Despite the rule's language giving automatic effect to disbarment, the district court permitted Palacios to continue practicing before it and complete the trial. When the court learned of the Ninth Circuit disbarment order, the district judge met with counsel, informed him of the order and the effect of the local rules, and warned him to take some action to appeal the circuit court's order. He further stated that although Palacios would be permitted to continue with the trial, he was "under an obligation to talk to [his] client about it." Despite the court's warning, Palacios did not inform Carvajal of his disbarment.[1]

---

1. Technically, Palacios may not have been disbarred from practicing in the district court because no formal disbarment order was entered despite the court rules' requirements. However, courts have overlooked technical defects in attorney status in right to counsel cases. *See, e.g., Solina v. United States*, 709 F.2d 160, 167 (2d Cir.1983) ("[W]e do not intimate that any technical defect in the licensed status of a defendant's representative would amount to a violation of the Sixth Amendment."); *Wilson v. People*, 652 P.2d 595 (Colo.1982) (failure of attorney to take oath for admission to state bar did not constitute ineffective assistance of counsel). Likewise, we should overlook the technical defect in Palacios disbarment status.

Even if the local rules gave the district court the discretion to allow Palacios to continue his representation through the trial, Palacios was a disbarred attorney in all but name. He certainly would not have been permitted to practice before the court on any other matter. Indeed, if it had not been for the ongoing trial, the district court likely would have immediately issued the

## II.

The most obvious reason for reversing Carvajal's conviction is that his Sixth Amendment right to counsel was violated. The right to counsel contains several guarantees, including the right to competent counsel, the right of a defendant to participate meaningfully in the defense and make important decisions, the right to receive important information, and the right to a loyal attorney, free from conflicting interests. The Majority misanalyzes this case by considering it only as a right to competent counsel situation.

One of the Sixth Amendment's most fundamental guarantees is the right of a criminal defendant to representation by competent counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); *United States v. Tucker,* 716 F.2d 576, 579 (9th Cir.1983). "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland,* 104 S.Ct. at 2063 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942)).

Equally important, however, is the defendant's right to participate in the defense. The Sixth Amendment

> does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' and who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.'

*Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). The defendant's right to participate in the defense includes the right to make important decisions, such as waiving attorney representation, *see Faretta,* 422 U.S. at 821, 95 S.Ct. at 2534, and waiving a jury trial, *see United States v. Cochran,* 770 F.2d 850, 851 (9th Cir.1985) (court must ensure defendant's waiver of jury trial is made voluntarily, knowingly, and intelligently). The need to protect the individual's role in the defense is punctuated by the fact that it is the defendant and no one else who confronts a loss of liberty. *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540.

The right to participate in one's defense becomes meaningless without the concomitant right to be informed of important developments in the case. Without information, the defendant cannot make intelligent decisions. Courts have repeatedly recognized the need for meaningful communications between attorney and client. *See, e.g., Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (sequestering defendant during recess between direct and cross-examination improperly interfered with right to counsel);

---

disbarment order required by the local rules. Permitting Palacios to complete the trial might be considered a stay of enforcement of the automatic disbarment; but for purposes of the Constitution, Palacios was a disbarred attorney.

The Majority contends that the district court's action was not unreasonable because there was "an ongoing jury trial of two defendants who were charged with multiple and very serious criminal offenses" and because the trial was at its "closing stages." Slip op. at 695. However, the news of Palacios' disbarment came in the second week of an eight week trial—hardly the "closing stages."

The Majority's characterization of the circumstances underscores the importance of protecting individual rights without regard to our own predelictions of the individual. Constitutional rights do not, and should not, depend on the seriousness of the government's allegations. If anything, the seriousness of the crime charged justifies the need for greater scrutiny of, not greater deference to, trial court errors. *Cf. House v. Balkcom,* 725 F.2d 608, 615 (11th Cir.) (seriousness of charge must be considered in assessing counsel's performance), *cert. denied,* — U.S. —, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984).

In any event, I do not resolve whether the trial court was correct in delaying the enforcement of Palacios' disbarment because I conclude that a client has Due Process and Sixth Amendment rights to be present at an *in camera* discussion of the disbarment issue and to be informed of the disbarment from both the trial and appellate courts.

*Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir.) (recognizing right to private consultation with attorney), *cert. denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977); *United States v. Allen*, 542 F.2d 630, 633 (4th Cir.1976) (right to counsel violated when defendant denied consultation with attorney during recess), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1179, 51 L.Ed.2d 584 (1977). Furthermore, courts have invalidated convictions of defendants incapable of communicating effectively with their attorneys regardless of the strength of the government's case. *See, e.g., Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").[2]

The constitutional right to counsel also imposes ethical obligations on attorneys. Rules of professional responsibility require an attorney to provide the client with all information needed to make decisions. *See, e.g., Martin v. Texas*, 694 F.2d 423, 425 (5th Cir.1982) (failure to inform client of right to appointed counsel on appeal constitutes ineffective assistance of counsel); *Gairson v. Cupp*, 415 F.2d 352, 353 (9th Cir.1969) (failure to inform client of right to appeal constitutes ineffective assistance of counsel); Model Rules of Professional Conduct Rule 1.4; *American Bar Association Standards for Criminal Justice, The Defense Function* § 3.5(a) (1971) ("At the earliest feasible opportunity defense counsel should disclose to the defendant any interest in or connection with the case or any other matter that might be relevant to the defendant's selection of a lawyer to represent him."). The attorney also owes a duty of loyalty to the client. *See, e.g., United States v. Alvarez*, 580 F.2d 1251, 1256 (5th Cir.1978) ("[W]e have always considered the undivided loyalty of counsel as essential to due process."); *United States v. Jeffers*, 520 F.2d 1256, 1262–63 (7th Cir.1975) (Sixth Amendment requires not only minimum competency but also "counsel whose undivided loyalties lie with his client"), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976). This duty of loyalty requires the attorney to place the client's interests above the attorney's personal or monetary interests.

The Majority reviews Carvajal's claim under the traditional ineffective assistance of counsel standard.[3] The majority thus equates the seriousness of the ethical and constitutional violations involved with a counsel's failure to call a witness, for example, or to object to an improper line of questioning. The right to be informed of disbarment strikes at more fundamental concerns than whether an attorney proved to be "incompetent."[4]

**2.** There are some limitations. For example, the Sixth Amendment is not violated when the defendant's actions raise the barrier to effective communications. *See, e.g., Shaw v. United States*, 403 F.2d 528, 529 (8th Cir.1968) (defendant's refusal to cooperate precludes ineffectiveness of counsel claim). In addition, some communications would endanger a third party. *United States v. Howell*, 527 F.2d 1373, 1374 (5th Cir.) (prohibiting disclosure of jury bribery investigation to client-defendant not violative of Sixth Amendment), *cert. denied*, 429 U.S. 838, 97 S.Ct. 109, 50 L.Ed.2d 105 (1976). Any such circumstances are obviously absent in this case.

**3.** Reviews of Sixth Amendment challenges to the effectiveness of attorney representation often involve courts determining the attorney's competence. To avoid second-guessing an attorney's strategic decisions, courts must use a fairly stringent standard for reversing a conviction for ineffective assistance of counsel. For such challenges, the defendant must show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland*, 104 S.Ct. at 2064.

**4.** The Majority concedes that some one never admitted to practice cannot provide effective representation, but asserts that the same reasoning does not apply when one is disbarred. Slip op. at 698. The distinction between a never-admitted attorney and a disbarred one makes little sense. The discipline imposed against the attorney in this case was for failing to protect his client's right to appeal, a classic example of refusing to represent a client's interests. Although Palacios proved that he was sufficiently competent to pass a bar exam, he was utterly incapable of representing his clients. Such

Using the traditional ineffective assistance of counsel standard is inappropriate when the attorney's actions, as here, threaten the foundation of the adversary process. The situation here more closely resembles a question of conflict of interest than one of effective assistance of counsel, because this case does not involve an assessment of whether the attorney performed competently.[5] As the court reasoned in *Alvarez*, 580 F.2d at 1256–57 (footnote omitted):

> Unlike *competency* of representation, where an attorney's conduct may fall anywhere along a continuum ranging from the incompetent to the superlative, conflict-laden representation is not susceptible of such fine gradations. Such representation is invidious, often escaping detection on review, and is tantamount to a denial of counsel itself.

An attorney's refusal to disclose his or her disbarment to the client creates a conflict of interest, rather than being merely ineffective assistance of counsel. Withholding from Carvajal information that Palacios was disbarred so thoroughly violated Palacios' ethical obligations that his representation became meaningless. This nondisclosure, probably more than any other act, illustrates the true allegiance of those attorneys who place their own financial reward above the duties they owe to their clients. This situation presents the worst sort of conflict of interest; attorney deception and self-interest surely destroy the fiduciary relationship with the client. This inherent violation of the Sixth Amendment's right to counsel, present when a person masquerades as a practicing attorney, has prompted the two circuits addressing this issue to adopt per se rules about such attorney conduct. Both courts reversed a conviction under such circumstances, without requiring any showing of prejudice. *Solina v. United States*, 709 F.2d 160, 168 (2d Cir.1983) (reversing conviction despite overwhelming evidence of guilt); *Harrison v. United States*, 387 F.2d 203, 212 (D.C.Cir.1967), *rev'd on other grounds*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).[6] When attorney misconduct is so severe as to offend one's sense of justice or is so contrary to the notion of ethical behavior as to completely

---

proven inability as a lawyer is not required to reverse a conviction under the Majority's reasoning.

But even if the ineffectiveness standard were proper for this case, I would conclude that Palacios refusal to inform his client of the disbarment constituted such incompetence, especially in light of the district court's order to do so.

**5.** The Supreme Court noted in *Strickland* that the prejudice requirement is presumed when there has been "[a]ctual or constructive denial of the assistance of counsel altogether." 104 S.Ct. at 2067. Such a denial occurs when counsel breaches a duty of loyalty owed to the client by representing conflicting interests. *See id.; Cuyler v. Sullivan*, 446 U.S. 335, 345–50, 100 S.Ct. 1708, 1716–19, 64 L.Ed.2d 333 (1980).

**6.** The Majority's reliance on *United States v. Hoffman*, 733 F.2d 596 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984), is misplaced. The factual circumstances in *Hoffman* are inapposite to this case. The attorney in *Hoffman* had been merely suspended from practice by the Florida State Bar for six months; in the decision, this court emphasized the limited duration of the suspension, *id.* at 600. In addition, the client-defendant probably knew of the disbarment. *Id.* at 598 n. 2. By contrast, Palacios was permanently disbarred from the Ninth Circuit and the district court, and it is conceded that the defendant did not know of the disbarment order.

Moreover, the attorney in *Hoffman* could not be disbarred by the district court without a separate hearing. The rules in *Theard v. United States*, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957), required a hearing prior to disbarment because a state court had suspended the attorney, and therefore prevented the local rules from taking effect automatically. The legal circumstances in this case are quite distinguishable. Whereas the *Hoffman* attorney was suspended by a state court, a fact found crucial in *Theard*, 354 U.S. at 281, 77 S.Ct. at 1276, Palacios was disbarred by a court in the same judicial system.

Finally, the fact that Palacios had been disbarred by the very court to which the appeal had to be taken is relevant. At the very least, Palacios' refusal to inform Carvajal that he would be unable to represent him on appeal violated his ethical obligations. Any counsel in Palacios' position, even if permitted by the district court to continue through the trial, would have had little incentive to perfect the record on appeal since the appellate court had prohibited him from practicing.

undermine the trust relationship, reversal of a conviction should be automatic.

The Sixth Amendment guarantees more than a disbarred attorney must perform competently for a conviction to stand. Carvajal had a right to know of conversations between his attorney and the judge. The district court even recognized Palacios' serious ethical obligations and instructed him to inform Carvajal. By not informing his client of the disbarment or his conversation with the district court, Palacios violated Carvajal's Sixth Amendment rights.

Our obligation to uphold democratic principles and justice demand that we reverse Carvajal's conviction. The legitimacy of the adversary system depends on a trusting attorney-client relationship. When we ignore the failure of that crucial relationship in a particular case, we undermine our entire criminal justice system. The Majority today ignores that Palacios no longer represented Carvajal's interests.

### III.

An independent reason for reversing Carvajal's conviction is that his constitutional right to be present at the conference between Palacios and the district judge was violated. The Constitution guarantees a criminal defendant the right to be present at every critical stage of a trial. *See, e.g., United States v. Gagnon,* —— U.S. ——, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (right guaranteed by Due Process Clause); *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) (right guaranteed by Confrontation Clause); *see also* Fed.R.Crim.P. 43. The Constitution guarantees the right of the accused to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Snyder v. Massachusetts,* 291 U.S. 97, 105–06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934).

Of course, a defendant is not entitled to be personally present at every proceeding in the case. In confining the right to be

present to critical stages, courts assume that the defendant's attorney will represent the defendant's interests in noncritical proceedings. *See, e.g., United States v. Vasquez,* 732 F.2d 846, 849 (11th Cir.1984) (no right to be present at bench conference attended by defendant's attorney to discuss cross-examination of defendant); *United States v. Williams,* 455 F.2d 361, 365 (9th Cir.) (notice of conferences need not be sent to defendant because court assumes attorney represents defendant's interests) (following *United States v. Alper,* 449 F.2d 1223 (3d Cir.1971)), *cert. denied,* 409 U.S. 857, 93 S.Ct. 140, 34 L.Ed.2d 102 (1972); *United States v. Jorgenson,* 451 F.2d 516, 521 (10th Cir.1971) (no right to be present at *in camera* conference on evidence questions when attorney present), *cert. denied,* 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972).

Due Process thus assures a right of presence unless such presence " 'would be useless, or the benefit but a shadow.' " *United States v. Christopher,* 700 F.2d 1253, 1262 (9th Cir.) (quoting *Polizzi v. United States,* 550 F.2d 1133, 1138 (9th Cir.1976)), *cert. denied,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). Even the ablest attorney cannot replace the defendant at certain critical proceedings, at which the defendant's presence can never be "useless." *See, e.g., Henderson v. Morgan,* 426 U.S. 637, 647, 96 S.Ct. 2253, 2258, 49 L.Ed.2d 108 (1976) (defendant must be apprised of charge before guilty plea may be accepted); *Hall v. Wainwright,* 733 F.2d 766, 775 (11th Cir.1984) (defendant may never waive right to be present in capital case), *cert. denied,* —— U.S. ——, 105 S.Ct. 2344, 85 L.Ed.2d 858 (1985).

This right includes the right to be present during *ex parte* communications between a judge and the defense counsel that so vitally affect the trial. Discussions about Palacios' disbarment and its effect on his ability to continue representation in the case surely qualifies as such a vital communication.[7] Most important, we can-

---

7. The conference between Palacios and the dis- trict court judge was *not a general disbarment*

not assume that the attorney represents the defendant's interests in such a proceeding, or that the defendant's presence would be "useless." A defendant must have the opportunity to attend such a conference.

The violation of a defendant's right to be present at the proceeding does not necessarily require automatic reversal of a conviction. In many situations, appellate courts may affirm a conviction "if in the particular case the defendant's absence was harmless beyond a reasonable doubt." *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir.), *modified on other grounds*, 768 F.2d 1090 (9th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1271, 89 L.Ed.2d 579 (1986). The harmless error rule does not apply, however, when "societal interest in seeing that the forms of trial are preserved" demands reversal of the conviction. *Badger v. Cardwell*, 587 F.2d 968, 978 (9th Cir.1978).[8] For example, courts employ a per se reversal rule when a defendant is absent from the jury selection process, because the defendant has an absolute prerogative to exercise peremptory challenges. *See, e.g., United States v. Washington*, 705 F.2d 489, 497 (D.C.Cir.1983).

I believe that the present situation warrants automatic reversal. As in the jury selection cases, Carvajal had an absolute prerogative to dismiss his disbarred attorney. Moreover, cases finding harmless error in right to be present cases do so because the court found that the attorneys adequately represented the defendants' interests. *See, e.g., Miller*, 757 F.2d at 995; *United States v. Stratton*, 649 F.2d 1066, 1080 (5th Cir.1981). Here, not only did

Palacios fail to protect Carvajal's rights, but his interests directly conflicted with Carvajal's. I would reverse Carvajal's conviction because his right to be present at the conference between Palacios and the district judge was violated.

The standard that this dissent suggests is neither novel nor cumbersome. It simply recognizes that a client-defendant in a criminal action has the right to be informed that his or her attorney has been disbarred. This right does not require any affirmative action on the part of the court, except the duty to ensure that the client has been notified once the court has been informed of the disbarment and to permit the defendant to attend any conferences on the issue. The decision to proceed with disbarred counsel lies with the client. If the client wishes to obtain other counsel, a continuance or mistrial motion may then be appropriate. I do not suggest what standard should govern the trial court's review of such a motion. But I hasten to add that judicial convenience should be a low priority when the right to counsel has been so thwarted.

---

proceeding. The conference directly related to the defendant's representation in the pending criminal trial. I do not decide whether a defendant has a right to be present at a disbarment proceeding wholly separate from the underlying criminal matter.

**8.** We have recognized that the right of presence not only protects the integrity and reliability of the judicial process, but also prevents " 'the loss of confidence in courts as instruments of justice which secret trials would engender.' " *Badger*, 587 F.2d at 978 (quoting *United States v. Gregorio*, 497 F.2d 1253, 1258 & n. 10 (4th Cir.1974)). *Badger* involved a defendant representing himself who was excluded from the courtroom for asking repetitive and irrelevant questions.

The reasoning in *Badger* controls the present case. I can envision few instances in which public confidence in our judicial process will be so severely affected. This case represents a classic situation of a "secret trial"; the district judge and the defendant's attorney decided that the attorney—though permanently disbarred by the Ninth Circuit—would be permitted to continue his representation in this case. Such callous disregard for the defendant's rights in the matter is exactly what the *Badger* court warned against.