**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

HERACLIO OSORIO-ARELLANES, AKA Laco,

*Defendant-Appellant*.

No. 20-10003

D.C. No.
4:11-cr-00150-DCB-LCK-4

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted February 13, 2024
University of Arizona College of Law (Tucson)

Filed August 9, 2024

Before: Michael Daly Hawkins, Andrew D. Hurwitz, and
Roopali H. Desai, Circuit Judges.

Opinion by Judge Hawkins;
Dissent by Judge Hurwitz

# SUMMARY[*]

## Criminal Law

The panel reversed the district court's order reconsidering its suppression of a confession by Heraclio Osorio-Arellanes ("Osorio"), vacated his convictions and sentences, and remanded for further proceedings.

Osorio participated in a chaotic firefight with U.S. Customs and Border Patrol agents in Arizona. Osorio fled back into Mexico, and one of the agents died from wounds he sustained in the confrontation. Federal indictments and a manhunt followed. Nearly seven years later, Osorio was arrested by Mexican authorities and interrogated by U.S. officials in a Mexico City prison. During this interrogation, he confessed essential elements of the Government's case on the advice of a Mexican attorney, Juan Salvador Pimentel.

On direct appeal, Osorio claimed he is entitled to a new trial because his confession was taken and admitted in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to effective assistance of counsel.

The panel exercised its discretion to hear the Sixth Amendment claim on direct appeal because (1) the record is sufficiently developed in that there is no ambiguity as to what Pimentel said to Osorio, and (2) the developed record shows that Pimentel's mid-interrogation advice—that Osorio would not be affected if he confessed information

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

about his intent toward drug smugglers because robbing drug smugglers is not a crime—was obviously inadequate and legally unjustifiable.

Addressing the substance of the claim under the framework identified in *Strickland v. Washington*, 466 U.S. 668 (1984), the panel held (1) Pimentel's counsel was deficient; and (2) Pimentel's advice was prejudicial because there is a reasonable probability that, absent Pimentel's advice, Osorio would not have been convicted of any of the charges.

Because Osario established his Sixth Amendment claim, the panel did not need to reach his Fifth Amendment claim. The panel rejected the Government's argument that the absence of a Fifth Amendment violation would bar Osario's Sixth Amendment claim.

Dissenting, Judge Hurwitz would affirm the conviction and require Osorio to make his case for ineffective assistance of counsel in the first instance in the district court through a 28 U.S.C. § 2255 motion.

---

## COUNSEL

D. Benjamin Holley (argued), Special Attorney for the United States; Daniel E. Zipp, and Fred Sheppard, Assistant United States Attorneys; Andrew R. Haden, Acting United States Attorney; Merrick B. Garland, Attorney General; Department of Justice, Office of the United States Attorney, San Diego, California; for Plaintiff-Appellee.

Tony F. Farmani (argued), Farmani PLC, Rancho Santa Fe, California, for Defendant-Appellant.

# OPINION

HAWKINS, Circuit Judge:

By any measure, this is an extraordinary case. Late on December 14, 2010, appellant-defendant Heraclio Osorio-Arellanes ("Osorio") participated in a chaotic firefight with U.S. Customs and Border Patrol agents in a remote mountain area south of Tucson, Arizona. When the shooting stopped, Osorio fled into the night and, eventually, back into Mexico. Tragically, one of the Border Patrol Agents, Brian Terry, died from wounds he sustained in the confrontation.

Federal indictments and a manhunt followed. Nearly seven years later, Osorio was arrested by Mexican authorities and interrogated by U.S. officials in a Mexico City prison. During this interrogation, he confessed essential elements of the Government's case on the advice of a Mexican attorney. Before trial, Osorio's American counsel moved to exclude this confession, which the district court initially suppressed on Sixth Amendment grounds but later reversed following a Government motion for reconsideration. As a result, the confession was introduced at trial.

On direct appeal, Osorio claims he is entitled to a new trial because his confession was taken and admitted in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to effective assistance of counsel. For the reasons below, we conclude that Osorio has established his Sixth Amendment claim.

Accordingly, we reverse the reconsideration order, vacate Osorio's convictions and sentences, and remand his

case for proceedings consistent with the opinion that follows.[1]

## BACKGROUND

### I. The Crime.

Deep within the Atascosa Mountain Range, about fifty-seven miles south of Tucson and eleven miles north of the Mexican border, groundwater swells support a lush desert oasis known as the Mesquite Seep.  The surrounding terrain is rough and remote.  The area is covered with rigid peaks and steep cliffs, so the Seep's flora and fauna are only accessible by single-lane footpaths and all-terrain vehicles.  These features make the Mesquite Seep a choice destination for hikers and nature enthusiasts.  They also made it an excellent drug trafficking corridor.

For years, couriers carried marijuana in backpacks across the Seep.  At some point, perhaps sensing opportunity, small gangs known as "rip crews" began robbing drug couriers at gunpoint.  The Tucson Sector of the United States Border Patrol Tactical Unit ("BORTAC") eventually caught wind of this activity and developed "Operation Huckleberry" to apprehend armed individuals prowling the area.  The operation mostly consisted of BORTAC agents patrolling the Seep while lookouts monitored radio traffic and an intricate system of motion sensors.  When sensors went off, lookouts confirmed the trigger source and deployed armed ground agents to confront suspected rip crews.

This is what happened around 11:00 pm on December 14, 2010.  BORTAC Agents William Castano (the team

---

[1] We vacate Osorio's 18 U.S.C. § 924(c) conviction and sentence pursuant to *United States v. Taylor*, 145 S. Ct. 2015 (2022).

leader), Gabriel Fragoza, Timothy Keller, and Brian Terry were nearing the end of a forty-eight-hour shift in the Seep when one of their lookouts, Agent Charles Veatch, alerted them of individuals approaching their location. Visibility was bad that night, but Agent Castano spotted an armed group through a thermal imaging device and ordered his team to form a line on higher ground.

When the armed group was about fifteen yards away, Castano yelled down to them, "Policia! Policia! Policia!" Some members of the armed group ran, but others drew their weapons. Agent Fragoza yelled out several times in Spanish for the men to "get down" before firing a non-lethal round from his shotgun in the group's direction. A chaotic firefight erupted.

The exchange only lasted a few seconds. But, in the affray, Osorio's brother Manuel was wounded, and Agent Terry sustained a gunshot wound to his torso. Despite his fellow agents' attempts to provide life-saving care, Agent Terry lost consciousness at the scene and was pronounced dead on arrival at a nearby hospital. Manuel was treated by first responders and taken into federal custody. The remaining Border Patrol agents were unharmed, and the rest of the armed group escaped.

## II. The Aftermath: Investigation, Indictment, and Interrogation.

The next day, an investigative team led by FBI Agent Michelle Terwilliger collected evidence from the scene, including spent shell casings and five backpacks loaded with food, water, ammunition, and portable battery charging devices for cell phones. Forensic pathologists later surmised that Agent Terry was killed by an AK-47 bullet fired from a downhill position, but, as a practical matter, the shooter

could not be identified. Nevertheless, the FBI lab at Quantico, Virginia placed Osorio at the scene based on DNA evidence recovered from a water bottle he left behind.

On August 24, 2011, a federal grand jury returned an indictment, charging Osorio and four other men on nine counts for their participation in Agent Terry's death. The Fifth Superseding Indictment ("the Indictment") is the operative indictment. It includes the following counts: first- and second-degree murder under 18 U.S.C. §§ 1111 and 1114 (Counts One and Two); conspiracy to interfere with commerce by robbery and attempted inference with commerce by robbery under the Hobbs Act, 18 U.S.C. § 1951 (Counts Three and Four, hereinafter "the robbery charges"); four counts of assault on a federal officer under 18 U.S.C. § 111 (Counts Five through Eight); and the use and carrying a firearm during a crime of violence under 18 U.S.C. § 924(c) (Count Nine). Because it was impossible to determine which rip crew member fired the fatal shot, the Indictment advanced a felony-murder theory predicated on the robbery charges.[2] Indeed, it is undisputed that the Government needed to establish the robbery charges in order to secure convictions on every remaining count.

After the Indictment issued, extradition proceedings were initiated, provisional arrest warrants were executed, and, over the next several years, authorities apprehended, extradited, and convicted other members of the armed group.

---

[2] Essentially, the theory was that Osorio's group killed Agent Terry during an attempted Hobbs Act robbery because they were allegedly in the Seep to rob drug smugglers, and "[m]arijuana is brought from Mexico into the United States . . . by the drug smugglers. When that marijuana enters the United States from Mexico, it has traveled in foreign commerce, which is part of interstate commerce."

*See United States v. Osorio-Arellanes et al.*, 11-cr-0150-DCB-BGM; *United States v. Soto-Barraza*, 947 F.3d 1111, 1114 (9th Cir. 2020) (affirming convictions of two co-defendants).  Osorio was arrested by Mexican authorities on April 12, 2017.  While his extradition proceedings were underway, the Mexican Attorney General's office arranged an interrogation with U.S. officials in Reclusorio Sur, a Mexico City prison.

The U.S. officials arrived at the prison on July 27, 2017. FBI Special Agents Michael Dreher and Tenoch Aguilar conducted the questioning in Spanish in the presence of then-Assistant United States Attorney ("AUSA") Todd Robinson and Agent Terwilliger.  Authorities from the Mexican Attorney General's office were also present.  When the U.S. contingent arrived, Mexican officials told them that Osorio had requested the presence of his attorney, although there is some disagreement about who that was.  The group waited for almost three hours to honor Osorio's request, but his attorney never showed up.  One of the Mexican officials eventually suggested that a prison attorney might represent Osorio during the interrogation, but he declined this suggestion.  Agent Dreher encouraged Osorio to at least speak with the prison attorney before deciding, but Osorio declined again.

Shortly thereafter, a Mexican attorney named Juan Salvador Pimentel Ramirez ("Pimentel") entered the scene. It is unclear where Pimentel came from or what he was doing at the prison that day.[3]  Still, according to the interrogation

---

[3] As the district court noted at the initial suppression hearing: "Now, the facts that I don't have are, and I could have had but I don't have, Pimentel didn't drop out of a bag at this prison.  Somebody had to call him, contact

transcript, he spoke with the authorities and explained he had not "been in [Osorio's] case file," and that another attorney, Jonathan Toledo, was named in the extradition file. A Mexican official assured him this did not matter because they were only there "for public assistance, just to fulfill the requirement," not for "the extradition proceeding." Apparently satisfied, Pimentel spoke privately with Osorio for about ten minutes, Osorio consented to his representation, and the interrogation began.

Agent Dreher confirmed that Osorio had conferred with his attorney before reading his *Miranda* warnings and asking whether he had any questions. Osorio said nothing, but Pimentel chimed in to express confusion about the interrogation's underlying nature: "I don't know, if you'll allow me. Is this just the part pertaining to . . . the United States Department of Justice, or is it just the, what's it called? The part having to do with the police investigation . . . of what this investigation is about?" Agent Dreher explained that he and Agent Aguilar were "just here to find out . . . what happened," and Agent Aguilar affirmed that they were "just learning." An unidentified speaker nevertheless expressed that "they prosecute."

The agents then began questioning Osorio about the night of Agent Terry's death. Osorio confirmed he was present during the shooting, identified other members of the group, and explained their encounter with Border Patrol. Agent Dreher soon turned to the group's motivation.

When asked why they were walking through the Seep that night, Osorio claimed that the group only intended to

---

him, hire him, request him, instruct him, or ask him to come to this statement."

pick up food to "drop off in certain spots." On further questioning, Osorio's answer was the same: "They'd send us to drop off food on the roads." The agents apparently did not believe this story and continued to push the point: "But, what was the group's purpose?" Osorio responded, "Well, they paid us to go drop food off, like I said." When the agents asked why the group carried weapons, Osorio noted their need for protection: "[T]here are a lot of bad people in the mountains."

As the interrogation went on, the agents tried other interrogation techniques to uncover Osorio's intentions toward drug smugglers. They claimed his co-defendants and family members had told them a different story. They pressed Osorio for specifics about dropping off the food, claimed they already knew he intended to rob drug smugglers as "a fact," and implored him to tell the truth.

They also empathized with his plight, noting the lack of work in his home state of Sinaloa and claiming they would not blame him for doing something illegal. At one point, Agent Dreher stated, with full knowledge of the Indictment charging otherwise, "[w]e're not charging you . . . with what you [sic] were doing against the drug runners, that has nothing to do with it." But Osorio did not bite.

That changed, however, when Pimentel offered some legal advice:

> Heraclio, on your behalf and as your lawyer, I can tell you in front of all of them, . . . they can't establish that you committed that crime, I mean, how is it possible for you to rob somebody . . . who was carrying out an illegal activity . . . I mean . . . there's no crime

for another crime, right? So since they're alleging that you're affecting . . . the drug runner's trade . . . it will not affect you if you tell them about it.

On these assurances, Osorio began providing authorities with incriminating information about his intent to rob drug smugglers in the Seep. For example, Agent Dreher's next question was, "When you robbed the drug runners, how much did they pay you?" to which Osorio responded, "Well, it depends, maybe ten thousand." He went on to offer other incriminating admissions, such as his knowledge of the Mesquite Seep's terrain and the types of drugs that smugglers carried. He also admitted five previous attempts to rob drug smugglers, including specific logistical details about those attempts, and disclosed that he had previously smuggled drugs through the area.

Finally, the agents asked whether anyone had specifically instructed the group to rob drug smugglers in the Seep on the night of the shootout. Osorio answered in the affirmative, and an agent followed up, "But . . . did you also know" to go to the Seep "because you'd been through there before?" "Yes," he replied, "well, more or less," thus confirming his past experiences with robbing drug smugglers and his intent to rob drug smugglers on the night of Agent Terry's death.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. "We review de novo the district court's denial of a motion to suppress." *United States v. Morgan*, 738 F.3d 1002, 1005 (9th Cir. 2013). We also review constitutional questions de novo. *See United States v. Benlian*, 63 F.3d 824, 826 (9th

Cir. 1995) (Sixth Amendment); *United States v. Hulen*, 879
F.3d 1015, 1018 (9th Cir. 2018) (Fifth Amendment).

We review the district court's factual findings for clear
error. *United States v. Bassignani*, 575 F.3d 879, 883 (9th
Cir. 2009). These factual findings include "scene and
action-setting questions," and "the circumstances" of an
interrogation. *Id.* (quoting *Thompson v. Keohane*, 516 U.S.
99, 112 (1995)). But "[t]he finding of a knowing and
voluntary waiver is a mixed question of law and fact which
we review *de novo.*" *Campbell v. Wood*, 18 F.3d 662, 672
(9th Cir. 1994) (en banc).

## ISSUES

In this direct appeal, Osorio claims he is entitled to a new
trial because his confession was taken and admitted in
violation of his Fifth Amendment right against self-
incrimination and his Sixth Amendment right to effective
assistance of counsel. The Government argues that no
constitutional violations occurred, and even if they did:
(1) the record is insufficiently developed to consider
Osorio's Sixth Amendment claim on direct appeal; (2) his
Sixth Amendment claim is barred by his Fifth Amendment
waiver; and (3) no court has ever considered an ineffective
assistance of counsel claim in this context.

For the reasons below, we conclude that Osorio has
established his Sixth Amendment claim. Our analysis
proceeds as follows: First, we exercise our discretion to
consider Osorio's Sixth Amendment claim on direct appeal.
Second, we resolve the substance of that claim in his favor
under the framework identified in *Strickland v. Washington*,
466 U.S. 668 (1984). Finally, we reject the Government's
contention that Osorio's Sixth Amendment claim rose and
fell with his Fifth Amendment claim.

## I.  Direct Review.

As a threshold matter, we must decide whether to consider Osorio's Sixth Amendment claim on direct appeal. "[T]he decision to defer resolution of an ineffective assistance of counsel claim is a discretionary one." *United States v. Miskinis*, 966 F.2d 1263, 1269 (9th Cir. 1992). "However, as a general rule, we do not review challenges to the effectiveness of defense counsel on direct appeal." *United States v. Jeronimo*, 398 F.3d 1149, 1155 (9th Cir. 2005), *overruled on other grounds by United States v. Jacobo Castillo,* 496 F.3d 947, 957 (9th Cir. 2007) (en banc).  The rationale for the general rule is that ineffective assistance of counsel claims "usually . . . cannot be advanced without the development of facts outside the original record." *Jeronimo*, 398 F.3d at 1156 (quoting *United States v. Birges*, 723 F.2d 666, 670 (9th Cir. 1984)).

The general approach reflects this Court's concern that appellate courts might "become engaged in the perilous process of second-guessing." *Birges*, 723 F.2d at 670 (quoting *People v. Pope*, 590 P.2d 859, 867 (Cal. 1979)). Without a fully developed record:

> Reversals would be ordered unnecessarily in cases where there were, in fact, good reasons for the aspect of counsel's representation under attack.  Indeed, such reasons might lead a new defense counsel on retrial to do exactly what the original counsel did, making manifest the waste of judicial resources caused by reversal on an incomplete record. *Id.*

Nevertheless, there are two exceptions to our general rule. We may consider Sixth Amendment claims on direct appeal when: (1) the record "is sufficiently developed," or (2) an attorney's performance is "so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." *Jeronimo*, 398 F.3d at 1156. Both exceptions apply here.

### A. There is no ambiguity about "what" Pimentel said.

To start, the ineffectiveness alleged on appeal—Pimentel's erroneous legal advice—stems from a single incident that is fully reflected in the interrogation transcript. *See United States v. Alferahin*, 433 F.3d 1148, 1161 n.6 (9th Cir. 2006) ("Defense counsel's alleged ineffectiveness in this case stems from a specific and discrete conversation, recorded clearly in the record."). In some cases, additional information may be needed to understand "what" advice an attorney gave. *See United States v. Pope*, 841 F.2d 954, 958 (9th Cir. 1988) (explaining that in many cases a defendant must "develop a record as to what counsel did" and "why it was done"). However, when a Sixth Amendment violation is based on an isolated instance of an attorney's recorded conduct, this Court may properly exercise its discretion to consider the claim.[4] Thus, Osorio's Sixth Amendment claim is ripe for direct review.

Nevertheless, our dissenting colleague notes that "[o]n the few occasions when we have found a record sufficiently

---

[4] *See United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991) ("In pursuing his claim of ineffectiveness of counsel, Swanson relies solely on the reported statements made by Mr. Ochoa during final argument. Accordingly, the record is sufficient for a review of the merits of Swanson's constitutional claim on this direct appeal.").

developed to depart from this customary practice, that record was usually made in a judicial proceeding." True as that may be, the Sixth Amendment's protections indisputably cover deficient conduct that occurs outside of formally adjudicative settings, and the Government concedes that the Sixth Amendment applied during the interrogation. *See Missouri v. Frye*, 566 U.S. 134, 140 (2012) ("It is well settled that the right to the effective assistance of counsel applies to certain steps before trial," including "postindictment interrogations."); *United States v. Leonti*, 326 F.3d 1111, 1114, 1117 (9th Cir. 2003) (discussing potential ineffective assistance of counsel claim arising from an attorney's conduct in the "pre sentencing cooperation period"). The Government does not argue that its self-produced transcript is inaccurate, so it is unclear how the source of this evidence precludes our direct review.

Moreover, the parties already received a full and fair opportunity to develop relevant facts during a judicial proceeding: Before trial, the district court held an evidentiary hearing on Osorio's Fifth and Sixth Amendment claims. There, the court considered evidence like the interrogation transcript and the advice-of-rights form that Osorio was provided at the beginning of his interrogation. During the hearing, Agent Dreher also testified about the Government's efforts to coordinate the interrogation with Mexican officials, the nature of Osorio's detention and his extradition status, and the circumstances of Pimentel's involvement in the interrogation.

Nothing further would be developed in habeas proceedings. To start, there is no mechanism to compel Pimentel's testimony because "federal courts lack power to secure the appearance of a foreign national located outside the United States," and Pimentel is a Mexican national

domiciled in Mexico. *States v. Beyle*, 782 F.3d 159, 170 (4th Cir. 2015).**[5]**   Furthermore, Osorio was available to testify during the evidentiary hearing, and the defense did not call him as a witness.   The Americans who attended the interrogation—Agent Dreher, Agent Terwilliger, Agent Aguilar, and Attorney Robinson—were also available for testimony, but only Agent Dreher was called.   He testified that he spoke directly with Pimentel outside of the recorded interrogation but that he does not recall the content of their conversation.   And, although "[t]he transcript includes over one hundred 'unintelligible' markings," the parties did not raise this argument on appeal, and Agent Dreher was asked about the markings during the evidentiary hearing.**[6]**   No one genuinely disputes the content of Pimentel's advice.   In this respect, the record is fully developed.

Nor is further record development needed to determine whether Osorio somehow assumed the risk of Pimentel's limited knowledge of American law.   No part of the Sixth Amendment analysis turns on what a criminal defendant knows about their attorney's qualifications, and criminal defendants do not waive their right to effective assistance of counsel by choosing their lawyers. *See United States v. Mouzin*, 785 F.2d 682, 698 (9th Cir. 1986) ("[A] lawyer's services [are] ineffective on a case, not a per se, basis.").

---

[5] *See also United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990) ("The government has no power to compel the presence of a foreign national residing outside the United States."); *United States v. Zabaneh,* 837 F.2d 1249, 1259–60 (5th Cir. 1988) (same); *see also* 28 U.S.C. § 1783(a) (providing for subpoenas of "a national or resident of the United States who is in a foreign country," but not referencing foreign nationals abroad); Fed. R. Crim. P. 17(e)(2).

[6] Agent Dreher answered questions about instances where unintelligible markings might have obscured relevant portions of the transcript.

Instead, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance." *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984). Osorio's beliefs about Pimentel's efficacy simply have no bearing on our Sixth Amendment analysis.

Importantly, the right to effective assistance of counsel exists because it has long been understood that "[a] layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance." *Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986). Yet, the Government asks us to suppose that Osorio waived this right because he was sufficiently proficient in comparative criminal law to appreciate the risks posed by accepting foreign representation during the critical stages of American proceedings. Under *Strickland* and its progeny, we cannot make that assumption. *See Maine v. Moulton*, 474 U.S. 159, 169 (1985) (noting that the right to counsel embodies "a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938)).

And, as a more general matter, we will not, especially where the forced choice between foreign and domestic counsel was made "possible only under color of state authority, and wholly within the power of the State to prevent." *Vasquez v. Hillery*, 474 U.S. 254, 262 (1986). There is no dispute that the Government initiated extradition proceedings against Osorio and facilitated his interrogation with Mexican officials. There is also no dispute about why the interrogation took place in Mexico: During the

evidentiary hearing, the district court asked why the Government did not simply wait to interrogate Osorio in the United States, where he would soon be physically present, immediately arraigned, and assigned an American attorney. The Government responded that the investigative team wanted to continue searching for another fugitive in Mexico. No further justification was suggested during the hearing nor when the question was raised again during oral argument.

Although the Government's investigative interest is entirely legitimate, this expediency concern does not trump fundamental constitutional rights when a criminal defendant is already in foreign custody and subject to ongoing extradition proceedings. *Sell v. United States*, 539 U.S. 166, 180 (2003) (noting that, in addition to its "substantial interest in timely prosecution," the Government "has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one."); *see also Moulton*, 474 5 U.S. at 170 ("[T]o deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."). There is no suggestion that *Osorio* was at risk of escape. Thus, he did not assume the risk of the Government's decision to interrogate him in a location where the type of constitutional violation at issue was far more likely to occur. *See Moulton*, 474 U.S. at 174 ("[B]y intentionally creating a situation likely to induce [defendant] to make incriminating statements without the assistance of counsel, the Government violated [his] Sixth Amendment right to counsel." (quoting *United States v. Henry*, 447 U.S. 264, 274 (1980))).

The investigative team could have continued searching for the fugitive and waited to interrogate Osorio in the United States where his rights likely would have been much better protected. *See Addington v. Texas*, 441 U.S. 418, 427

(1979) ("The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state."). Under these circumstances, "[t]he Sixth Amendment mandates that the State bear the risk of constitutionally deficient assistance of counsel." *Kimmelman*, 477 U.S. at 379. Not Osorio.

Although the material facts on appeal are unusual, they are not unclear: Our legal analysis does not require any "facts we don't have" or could reasonably hope to obtain. The record is developed in every material respect.

**B.  The developed record also shows that Pimentel's mid-interrogation advice was obviously inadequate and legally unjustifiable.**

Moreover, even if there are facts we might like to have, we do not need them because the interrogation transcript shows that Pimentel's advice was so inadequate that it obviously denied Osorio's Sixth Amendment right to effective assistance of counsel. Under *Strickland*, counsel's strategic judgments are owed heavy deference. 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955))). Thus, ineffective assistance of counsel claims are ordinarily more appropriately evaluated during post-conviction proceedings, where evidentiary hearings might shed light on counsel's strategic reasoning. *See, e.g.*, *United States v. McGowan*, 668 F.3d 601, 606 (9th Cir. 2012) (declining review when reviewing court could not "tell from [the] record whether the [failure] . . . was a calculated stratagem or a mere oversight"

(internal citation omitted)).[7]   However, when counsel unquestionably acts (or fails to act) based on a mistaken legal or factual understanding, their conduct lacks strategic reason as a matter of law. *Wiggins v. Smith*, 539 U.S. 510, 526 (2003) (noting that when a "failure to investigate thoroughly resulted from inattention," it is "not strategic judgment.").

Pimentel's advice was blatantly incorrect. He stated that Osorio would not be affected if he confessed information about his intent toward drug smugglers because robbing drug smugglers is not a crime. Of course, robbing drug smugglers is a crime—and not only that: it was the precise crime Osorio was charged with committing under the Hobbs Act and the predicate offense to a first-degree murder charge that carried a mandatory life sentence.[8]   There is simply no justifiable reason for this advice. *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997) ("Even if [Pimentel's] decision could be considered one of strategy, that does not render it

---

[7] *See also United States v. Lillard*, 354 F.3d 850, 856 (9th Cir. 2003) (failure to call alibi witnesses); *United States v. Reyes-Platero*, 224 F.3d 1112, 1116 (9th Cir. 2000) (failure to request downward departure), *overruled on other grounds by Jacobo Castillo*, 496 F.3d at 957.

[8] The record shows that Pimentel had a valid professional license in Mexico, which was issued by the Department of Public Education, General Directorate of Professions. Nevertheless, whether Pimentel's counsel was reasonable by Mexican standards is entirely irrelevant to this analysis. *Strickland*, 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance."). Whatever the prevailing law in Mexico, we must measure Pimentel's conduct in relation to Osorio's Sixth Amendment right to meet the prosecution's case in an American proceeding. *Id.* at 690 ("[T]he court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."). Any contrary suggestion ignores *Strickland*'s objective and its only source of legitimacy.

immune from attack—it must be a *reasonable* strategy." (emphasis in the original)). It is objectively unreasonable, in any circumstances, to encourage a client's confession to live charges—without securing any deal from the prosecution—based on a blatant misunderstanding of case-determinative law.

No additional evidence could change that fact or render Pimentel's advice retroactively reasonable. *Noguera v. Davis*, 5 F.4th 1020, 1046 (9th Cir. 2021) ("[C]ourts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." (quoting *Harrington v. Richter*, 562 U.S. 86, 109 (2011))). The transcript clearly demonstrates that Pimentel was simply wrong, and thus, his counsel was so inadequate that it obviously denied Osorio's Sixth Amendment right to effective assistance of counsel.

Accordingly, we exercise our discretion to hear his Sixth Amendment claim on direct appeal.

## II. The Sixth Amendment: *Strickland v. Washington.*

We now turn to *Strickland*. The Sixth Amendment's Counsel Clause guarantees "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to counsel is "offense specific" and thus attaches at "the initiation of adversary judicial criminal proceedings," e.g., at indictment. *Texas v. Cobb*, 532 U.S. 162, 168 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). And the right to effective assistance of counsel "applies to pretrial critical stages that are part of the whole course of a criminal proceeding, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice." *Lafler v. Cooper*, 566

U.S. 156, 165 (2012).[9] "Interrogation by the State is such a stage." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *Massiah v. United States,* 337 U.S. 201, 204 (1964) ("[A] Constitution which guarantees a defendant the aid of counsel at such a trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding.").

There are several dimensions to the Sixth Amendment right to counsel. There is the paradigmatic application "that, with certain exceptions, a person accused of a federal or state crime has the right to have counsel appointed if retained counsel cannot be obtained." *Strickland*, 466 U.S. at 685. Another "element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). "That a person who happens to be a lawyer is present . . . alongside the accused, however, is not enough to satisfy the constitutional command." *Strickland*, 466 U.S. at 685. "[A]ccess to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled." *Kimmelman*, 477 U.S. at 384 (internal citations and punctuation omitted). Thus, the Supreme Court has also recognized that "the right to counsel is the right to the *effective* assistance of counsel." *Strickland*, 466 U.S. at 686 (emphasis added) (internal citation omitted).

To succeed on a claim for ineffective assistance of counsel, a defendant must show that their attorney's

---

[9] Because the Sixth Amendment right to counsel is "offense" (not "location") specific, we need not consider its extraterritorial application, especially when the prejudice alleged—and thus the ultimate constitutional violation—occurred in the United States.

performance was deficient and prejudicial.  *Strickland*, 466 U.S. at 687.

### A.  Pimentel's counsel was deficient.

To prove deficiency, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  That is, "a criminal defendant's counsel may be deemed ineffective only if counsel's performance falls outside the wide range of reasonable professional assistance." *United States v. Juliano*, 12 F.4th 937, 940 (9th Cir. 2021) (quoting *Torres-Chavez v. Holder*, 567 F.3d 1096, 1100–01 (9th Cir. 2009)).  "'[S]crutiny of counsel's performance must be highly deferential, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Id.*  "In particular, we must evaluate the conduct from counsel's perspective at the time, taking care not to view a lawyer's decisions in the distorting effects of hindsight." *Id.*

The Government finds itself in a strange position here: while arguing that Pimentel acted as Osorio's lawyer for *Miranda* purposes, it also argues that Pimentel was not acting as "counsel" for Sixth Amendment purposes because he is not licensed to practice law in the United States.  As both a practical and legal matter, however, Pimentel acted as Osorio's counsel during the interrogation.  The transcript makes clear that the relevant parties—the interrogating agents, Osorio, and Pimentel—understood that Pimentel was

Osorio's attorney during the interrogation.**[10]**  Pimentel was physically present during questioning, asserted himself as Osorio's counsel at several points, and attempted to advocate for him throughout the interrogation.

The Government also submitted post-interrogation documentation, apparently signed by all relevant parties, affirmatively stating that Pimentel was Osorio's "private attorney."  Nevertheless, the Government now claims that no court has found that "a person, selected by the defendant and who is licensed to practice law only in a foreign country, can be liable for ineffective assistance of counsel."    Putting aside these conflicting positions, and that *Strickland* does not subject attorneys to personal liability for their deficient performance, the issue is not so uncharted as the Government suggests.

It is settled law in this Circuit that an attorney's law license does not tip *Strickland*'s deficiency analysis.  We have recognized that, in certain circumstances, unlicensed attorneys can serve as "counsel" for Sixth Amendment purposes. *United States v. Hoffman*, 733 F.2d 596, 599 (9th Cir. 1984) (rejecting defendant's argument that upon disbarment, his attorney was no longer "counsel" within the

---

[10] Dreher: "I just handed this to you and to the gentleman, your attorney, who is here."

. . .

Dreher: "[Y]ou have your attorney with you here today."

Osorio: "Yes."

. . .

Pimentel: "[L]ook, Heraclio, on your behalf and as your lawyer . . . ."

meaning of the Sixth Amendment).[11]   Although "the Sixth Amendment guarantee of counsel means assistance by an attorney who has been found qualified to represent a client as evidenced by admission to the bar," unlicensed attorneys are not "automatically disqualified" from a case, and their services cannot be deemed per se ineffective "without regard to their intrinsic quality." *Mouzin,* 785 F.2d at 696.

Foreign attorneys representing indicted defendants in U.S.-initiated proceedings should not be measured by a separate standard. In many circumstances, foreign attorneys will certainly provide adequate counsel during overseas interrogations—a foreign attorney might have advised Osorio to remain silent based on their existing knowledge of American law, cursory research efforts, or even chance overlap between our respective national laws.[12]   Whatever the source of their advice, we are reluctant to hold that foreign attorneys can never be "counsel" for Sixth Amendment purposes. Indeed, such a holding would impede the Government's ability to conduct interrogations abroad and would sometimes require suppressing extraterritorial admissions at trial, even when, by American standards, the defendant's statements were provided on a foreign attorney's objectively superlative counsel. If a foreign

---

[11] *See also Cronic*, 466 U.S. at 665 ("The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation.").

[12] In fact, this has happened before. In *United States v. Straker*, 596 F. Supp. 2d 80, 85 (D.D.C. 2009), Straker followed his Trinidadian attorney's advice "not to sign any documents or speak to anyone" when the FBI was investigating his involvement in the kidnapping of a U.S. citizen.

attorney's advice enables a criminal defendant to meet the prosecution's case, their counsel is competent.

However, Pimentel's advice did not.  Even under *Strickland*'s highly deferential lens, his counsel was plainly deficient.    It  is  widely  understood  that  "during postindictment  questioning,  a  lawyer's  role  is  rather unidimensional:  largely limited to advising his client as to what questions to answer and which ones to decline to answer." *Patterson v. Illinois*, 487 U.S. 285, 294 n.6 (1988). Pimentel  unquestionably  failed  to  fulfill  this  role: Objectively reasonable counsel would never encourage a defendant's confession to live charges without first securing any agreement from the prosecution.[13]

If Pimentel's advice was a "strategic decision," it was not a permissible one.  The interrogation transcript demonstrates his fundamental ignorance on dispositive points of law, such as the intent to commit robbery under the Hobbs Act and felony murder.    *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (per curiam) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

---

[13] Consider this exchange between the Government and the district court during the pre-trial hearing on the motions to suppress:

> Government: "I would agree with the court that most criminal defense attorneys would instruct their client not to answer questions when the FBI seeks to interview their client."

> District Court: "Post indictment, without the offer of any deal, is there any lawyer that would let Mr. Osorio give this statement that he gave? [] I think I know the answer to that question already."

For example, while discussing the act of robbing drug smugglers, Pimentel said, "That can't be a crime. I don't know if in the United States, like, how can you rob drugs from somebody illegal, and here it can be . . . uh, I mean, I don't understand that." When discussing the charges, he asked, "what are the elements of first degree murder?" Further, long after he encouraged Osorio to admit essential elements of the Government's case, Pimentel thought to ask, "Is it possible that, just as you have a protected witness who, [] was able to negotiate with the justice system [] in the United States, that some of [Osorio's] testimony might work [] to benefit him? Here in Mexico you can negotiate."

Still, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Sometimes, a decision not to investigate is not deficient counsel when an attorney reasonably believes that additional investigation would be futile or when they decide to pursue one reasonable strategic line of investigation over another. *See Harrington*, 562 U.S. at 110 ("Richter's attorney was mistaken in thinking the prosecution would not present forensic testimony. But the prosecution itself did not expect to make that presentation and had made no preparations for doing so on the eve of trial."); *see also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). But "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *Strickland*, 466 U.S. at 690–91).

No reasonable professional judgment supports the limited nature of Pimentel's investigation. The interrogation transcript shows that Pimentel's advice stemmed from his misunderstanding of the underlying law and facts of Osorio's case. *See Kimmelman*, 477 U.S. at 384 (noting that the adversarial "testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies"). Objectively reasonable defense counsel would have spent more than ten minutes conferring with his client and would have reviewed the charges against him and his extradition file, especially when dealing with foreign authorities. *Rompilla*, 545 U.S. at 385 (finding deficient counsel where "even after obtaining the transcript of the victim's testimony on the eve of the sentencing hearing, counsel apparently examined none of the other material in the file").

Even if Pimentel was confused about the interrogation's nature, that confusion was not a reasonable professional judgment that can support his failure to investigate. *Kimmelman*, 477 U.S. at 385 (finding that an attorney's failure to conduct pretrial discovery based on a mistaken legal understanding was not "strategy"). At the interrogation's outset, the Government was clear that anything Osorio said could be used against him in a court of law. Pimentel was also told that the investigating agents and "the prosecutor handling the case" in the United States were present. Upon hearing the *Miranda* warnings and being alerted of the prosecutor's presence, objectively reasonable counsel would not have allowed the interrogation to continue without conducting at least some colorable investigation into the circumstances of Osorio's alleged crimes, the posture of

his case, and the legal theories supporting the charges against him.  Pimentel did none of that.

Thus, his counsel was deficient.

### B.  Pimentel's advice was prejudicial.

Because Osorio has proved Pimentel's counsel was deficient, we must consider whether it was also prejudicial. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[14]  *Strickland*, 466 U.S. at 694.  The *Strickland* prejudice standard is "highly demanding." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam) (quoting *Kimmelman*, 477 U.S. at 382).  Still, defendants are not required to show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693.  Instead, the likelihood of a different result must be "substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

In making our prejudice determination, we have thoroughly reviewed the parties' briefings and carefully inspected every document in the record.  The interrogation

---

[14] Pimentel's deficient advice occurred during a pre-trial interrogation. Typically, when ineffective assistance of counsel claims arise from attorneys' conduct in pre-trial contexts (like plea negotiations), the prejudice inquiry turns on whether the result of that proceeding—not the defendant's trial—would have been different.  Where no trial occurs, *Strickland*'s trial-based prejudice inquiry is unduly speculative with respect to counsel's pre-trial errors. *Garza v. Idaho*, 139 S. Ct. 738, 747 (2019) ("[T]here is no disciplined way to 'accord any "presumption of reliability" . . . to judicial proceedings that never took place.'" (internal citation omitted)).  Here, however, a trial occurred.  Thus, we consider the impact of Pimentel's deficient advice on Osorio's trial because doing so requires no speculation.

transcript shows that, but for Pimentel's advice, Osorio would not have confessed drug-related information to authorities. The Indictment, the preliminary jury instructions, and the prosecution's opening statement demonstrate that every charge against Osorio required the Government to prove his intent to rob drug smugglers beyond a reasonable doubt. The remaining trial transcripts show that Osorio's confession was the Government's key evidence on this dispositive factual dispute. [15]

Thus, there is a reasonable probability that, absent Pimentel's advice, Osorio would not have been convicted of any of the charges.

### i. "But for" Pimentel's advice, Osorio would not have confessed drug-related information.

The Government argues that Osorio "has not demonstrated that he would have refused to provide statements absent Pimentel's advice."[16] However, the transcript plainly makes that demonstration for him. Before Pimentel's advice, Osorio unequivocally refused to admit his intent to rob drug smugglers and flatly denied any previous involvement with drugs. The transcript also shows that these denials were not due to lack of official effort; the agents deployed all kinds of interrogation techniques to

---

[15] Whenever Osorio's "confession" is mentioned throughout this Section, the term only refers to drug-related information he admitted on Pimentel's advice.

[16] To be sure, before Pimentel's advice, Osorio confirmed aspects of his involvement in the shooting. However, Osorio does not allege that he would not have provided *any* statements without Pimentel's advice. The specific conduct he complained of was that "Pimentel advised and encouraged" Osorio's drug-related admissions "based on the erroneous understanding that it was not a crime to rob drug smugglers."

secure Osorio's confession.    Yet, throughout their questioning, Osorio did not deviate from his story about dropping off food in the Seep.  He said that he had never been caught with drugs, had never previously robbed drug smugglers, and did not intend to rob them on the night of Agent Terry's death.

The critical shift came after Pimentel's erroneous advice. It was only after receiving his attorney's mistaken assurances that Osorio began providing the agents with drug-related information he had previously refused to disclose. No other intervening event or Government action shook Osorio's initial story about the group's intent to deliver food. As Agent Dreher put it during the interrogation: "[E]arlier you told me[] that you . . . didn't rob the drug runners, right? And afterwards you confessed."

We need not speculate about whether Osorio would have confessed drug-related information to authorities "but for" Pimentel's advice.  In fact, he did not.

> *ii. Every charge turned on Osorio's intent to rob drug smugglers.*

As mentioned above, it is undisputed that the Government could not secure convictions on any of the counts without proving the robbery charges beyond a reasonable doubt.  Accordingly, the jury was instructed that Osorio's intent to rob drug smugglers was a necessary element of every crime he was charged with committing, including felony murder.  There is no allegation that these instructions were incorrect.  Thus, we presume that the jury weighed evidence on this dispositive point during its deliberations. *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) (per curiam) ("[I]n all cases, juries are presumed to follow the court's instructions.").

Indeed, the trial transcripts underscore the fundamental importance of Osorio's intent to rob drug smugglers. Within the first minute of opening statements, the Government described Osorio's group as a "rip crew," i.e., "individuals who came to the United States, armed themselves, and were patrolling in this rural area near Rio Rico looking for drug smugglers to rob." The opening statement also quickly zeroed in on the group's purpose: "[T]hey were ready for one thing and one thing alone, to carry out their mission in the wash that night, and that was to rob drug smugglers."

The Government's first presentation to the jury made its theory of the case perfectly clear: Agent Terry was killed "while [Osorio] was leading the rip crew through the wash looking for someone to rob."

### iii. Without Osorio's confession, there is a reasonable probability that he would not have been convicted.

Osorio's confession was the best evidence the Government had to prove this dispositive element of its case. However, that does not render Pimentel's advice per se prejudicial. "When," as here, "a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. Generally, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. And "in some instances" even an isolated error by counsel "can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial.'" *Harrington*, 562 U.S. at 111 (quoting *Murray v. Carrier,* 477 U.S. 478, 496 (1986)). Thus, we must consider the impact of Pimentel's

advice in light of "the totality of the evidence before the judge or jury . . . taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings." *Strickland*, 466 U.S. at 695–96.

We begin with the unaffected findings. Absent the confession, the Government certainly could have proved the general circumstances of the shootout. BORTAC Agent Daniel Herskin testified about monitoring the tripped sensor; Agents Castano, Fargoza, and Keller testified about the circumstances of the encounter with the rip crew, and first responders described the immediate aftermath. Moreover, BORTAC surveillance equipment took pictures of the skirmish in real-time, which the Government displayed throughout trial, and Agent Terwilliger testified about her crime scene investigation.

Aside from testimony and photographs, the Government also showed the jury physical evidence from the crime scene, like AK-47s, shell-casings, unspent ammunition, firearm lubricant, backpacks, food, water, portable batteries, cell phone chargers, and other survival supplies. Additionally, the Government's forensic pathology expert testified that Agent Terry's autopsy strongly suggested his fatal wound was caused by a single bullet fired from the rip crew's down-hill position, and the Government's firearm and tool marks expert testified about the investigation he conducted on shell casings recovered from the scene. The Government's DNA evidence also left virtually no doubt that Osorio was present during the shootout. There was also evidence that Osorio's brother Manuel was found injured at the scene, though he never provided any indication of the group's intent.

Collectively, this scene-setting evidence could have established that Agent Terry was killed during the shootout

by a member of Osorio's group, which was heavily armed and outfitted to spend a lot of time outside. Per *Strickland*, we take those facts as given. Even still, they were insufficient to secure Osorio's convictions: the Government also had to establish his intent to rob drug smugglers beyond a reasonable doubt.

The Government saved its best evidence on this point for last and called Agent Dreher as its final witness at trial. At the beginning of his testimony, Agent Dreher described the circumstances of the interrogation and then relayed the scene-setting information Osorio provided before Pimentel offered his deficient advice.[17] But that is where the Government's unaffected evidence ends: Agent Dreher's remaining testimony described the precise admissions Osorio would not have provided but for Pimentel's erroneous advice.

As the direct examination continued, the Government asked Agent Dreher whether Osorio stated the group's purpose during the interrogation, to which he replied, "[Osorio] said the purpose of the group was to rob other drug smugglers in the area." The Government then asked why the group had targeted the Seep in particular, and Agent Dreher described Osorio's admissions about his past experiences smuggling marijuana through the Seep, his five previous robberies of drug smugglers, and the payments he received

---

[17] When the Government began to ask about Osorio's drug-related admissions, the district court read the jury a limiting instruction pursuant to Federal Rule of Evidence 404 and noted that to the extent that Agent Dreher's testimony mentioned any past criminal conduct, the jury could only consider it only to establish Osorio's motive, opportunity, preparation, plan, knowledge, or absence of mistake. There was no limiting instruction concerning Osorio's admissions to the charged crimes.

for those efforts. Through this testimony, Agent Dreher placed the impact of Pimentel's deficient counsel squarely before the jury.

During closing arguments, the Government emphasized the importance of this testimony:

> "[Osorio] also told Agent Dreher that he had successfully robbed drug smugglers on five prior occasions, and you may consider that evidence of the prior robberies to show the defendant's intent on December 14th, 2010. He was in Mesquite Seep for one purpose and one purpose alone, to rob drug smugglers."

Without Agent Dreher's testimony, the Government's remaining evidence on Osorio's intent to rob drug smugglers was relatively speculative and weak. There was the BORTAC agents' testimony that they were in the Seep to apprehend rip crews or "armed bandits," and that the armed group's guns were in ready position when they encountered the agents. There was one photo from a surveillance camera showing suspected drug smugglers in the area several days before the shooting. There was also Agent Jason Weatherby's testimony about his experiences in the Seep, which suggested the area was frequented by drug smugglers, human traffickers, and rip crews. Agent Weatherby further testified that rip crews, unlike drug smugglers, were typically armed. But that was it. The Government did not introduce any other evidence concerning Osorio's intent to rob drug smugglers.

Overall, the unaffected evidence tends to show that drug smugglers sometimes traveled through the Seep, that rip crews tended to be armed, and that Osorio's group traveled

through the area with guns. This evidence might have been sufficient to convince the jury of Osorio's intent to rob drug smugglers beyond a reasonable doubt. *United States v. Gulino*, 588 F.2d 256, 258 n.2 (9th Cir. 1978) ("A defendant may be proven guilty by either direct or by circumstantial evidence."). However, we cannot say that it eliminates any substantial likelihood of the opposite result. The defense never conceded Osorio's guilt, and he never independently confessed the drug-related information he provided on Pimentel's advice. Osorio's co-defendants' convictions were not mentioned, none of his co-conspirators testified against him, and Osorio did not take the stand at trial.

There is at least a reasonable probability that without Pimentel's advice, the case might have come out differently. Thus, when viewed in light of the cumulative evidence, Agent Dreher's testimony establishes prejudice. Nevertheless, we do not rest our prejudice finding solely on this accounting of the Government's trial evidence: The district court's post-trial rulings independently place the issue beyond speculation.

Although the jury ultimately determined Osorio's guilt, before the case was submitted, defense counsel moved for acquittal on the robbery charges based on insufficiency of the evidence. Specifically, he argued that the Government could not prove any "substantial step" toward robbery because it presented no evidence that drug smugglers were in the Seep on the night of Agent Terry's death.

In considering this motion, the district court responded with its assessment of the evidence: "Well, here, though, is a stated intention. We're not just walking around with firearms. Specifically, this case is even stronger if one of the members says they're armed in order to rob smugglers in that

area where they are."  The court then expressly denied the motion by pointing to the fruits of Pimentel's deficient counsel: "[G]iven the experience of these rip crew members, the personal experience of the defendant, the fact that they were ready to fire, and to effect this robbery was a substantial step and, therefore, [] sufficient evidence, of an attempt." That is, all but one of the evidentiary bases the district court used to support its finding flowed directly from admissions induced by Pimentel's advice.  But for that advice, there is at least a reasonable probability that the district court's sufficiency determination (and thus, the case) would have come out differently.

Whatever the jury might have thought about the Government's unaffected evidence, the district court's sufficiency ruling also proves prejudice.  On either basis, Osorio has established his Sixth Amendment claim.**[18]**

---

[18] We recognize that our analysis is not limited to applying a series of "mechanical rules." *Strickland*, 466 U.S. at 696.  The "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.*  Specifically, "in every case," courts must consider "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*  There might be some question of what "reliability" means in this context.  Does a proceeding become unreliable when counsel's errors effectively circumvent the adversarial testing process that we rely on to produce just results?  Or can a court deem that proceeding's outcome reliable if it is sufficiently certain that the result is just, i.e., that it fairly assigns blame?  It seems the Supreme Court favors the former conception: "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659; *see also Kimmelman*, 477 U.S. at 380 ("[W]e have never intimated that the right to counsel is conditioned upon actual innocence.").  Regardless of whether Osorio's confession

## III.   The Fifth Amendment.

Because Osorio has established his Sixth Amendment claim, we need not reach his Fifth Amendment claim. Nevertheless, we briefly address the Government's position that Osorio's Sixth Amendment claim rises and falls with his Fifth Amendment claim. For the sake of argument, we will assume: (1) Osorio waived his Fifth Amendment rights, and (2) no underlying Fifth Amendment violation occurred. Neither assumption bars Osorio's Sixth Amendment claim.

First, the waiver point is immaterial. The *Miranda* warnings are specifically designed "[t]o safeguard the ***uncounseled*** individual's Fifth Amendment privilege against self-incrimination." *Keohane*, 516 U.S. at 107 (emphasis added). Thus, in cases involving Fifth Amendment waivers' impact on Sixth Amendment claims, the key question is whether a defendant's ***uncounseled*** confession is admissible because the *Miranda* warnings adequately conveyed his Sixth Amendment right to an attorney during an interrogation.[19]

---

was "reliable"—indeed, no one alleges it was false—Pimentel's deficient advice induced admissions that provided essential elements of the Government's case, which deprived Osorio of "the guiding hand that the Constitution guarantees." *Cronic*, 466 U.S. at 649; *see also Kimmelman*, 477 U.S. at 379, 391 (determining that on a sufficient showing of prejudice, an attorney's failure to suppress "reliable" but damning evidence, could amount to ineffective assistance of counsel). Indeed, given the dispositive impact of Pimentel's advice, the defense did not call a single witness or present any exhibits.

[19] *Montejo*, 556 U.S. at 791 ("[E]veryone agrees that absent a valid waiver, Montejo was entitled to a lawyer during the interrogation."); *see Maryland v. Shatzer*, 559 U.S. 98, 102 (2010) ("At no point during the interrogation did Shatzer request to speak with an attorney or refer to his prior refusal to answer questions without one.").

That question is simply inapposite when a defendant invokes his right to counsel, obtains counsel's physical presence during an interrogation, and relies on counsel's advice throughout questioning.  This defendant has not waived his right to counsel—he has plainly exercised it.  We are aware of no authority suggesting that Fifth Amendment waivers bar subsequent Sixth Amendment claims when a defendant's attorney was physically present during an interrogation and actively encouraged his client's admission.

Second, the Government suggests Osorio's Sixth Amendment claim must fail because it is actually a Fifth Amendment claim cloaked in *Strickland* dress.  The Sixth Amendment right to effective assistance of counsel and the Fifth Amendment right against self-incrimination support distinct constitutional claims that promote entirely separate interests.[20]  *Henry*, 447 U.S. at 273 (rejecting a line of argument that sought "to infuse Fifth Amendment concerns against compelled self-incrimination into the Sixth Amendment protection of the right to the assistance of counsel").  Osorio's Sixth Amendment claim is not invalid because it arises from a fact pattern that also implicates Fifth Amendment interests.  *See Patterson*, 487 U.S. at 297 ("While our cases have recognized a 'difference' between the Fifth Amendment and Sixth Amendment rights to counsel, and the 'policies' behind these constitutional guarantees, we have never suggested that one right is

---

[20] *Compare Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (noting that *Miranda* warnings are necessary in "certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination"), *with Strickland*, 466 U.S. at 689 ("[T]he purpose of the effective assistance guarantee of the Sixth Amendment . . . is simply to ensure that criminal defendants receive a fair trial.").

'superior' or 'greater' than the other."). These constitutional protections do not collapse based on the underlying factual circumstances. [21]  *See Henry*, 447 U.S. at 272 (holding that "Fifth Amendment claims made in" cases where undercover officers obtain incriminating statements before charges are filed "are not relevant to the inquiry under the Sixth Amendment").

The absence of a Fifth Amendment violation does not bar Osorio's Sixth Amendment claim.

## CONCLUSION

Osorio's jailhouse confession was admitted in violation of his Sixth Amendment rights. His convictions and sentences are set aside, and his case remanded to the district court for further proceedings consistent with this opinion.

Importantly, our holding does not decide Osorio's ultimate responsibility for his actions. The Government can still retry this case. Nevertheless, his direct appeal reaffirms the potency of our Constitution's procedural protections for criminal defendants, which "are granted to the innocent and the guilty alike." *Kimmelman*, 477 U.S. at 380. Due process, including the right to effective assistance of counsel, is what separates America from authoritarian regimes around the world. *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) ("The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.").

---

[21] *See also Estelle v. Smith*, 451 U.S. 454, 470 n.14 (1981) ("[W]e are not concerned in this case with the limited right to the appointment and presence of counsel recognized as a Fifth Amendment safeguard in *Miranda* . . . Rather, the issue before us is whether a defendant's Sixth Amendment right to the assistance of counsel is abridged.").

**VACATED, REVERSED, AND REMANDED.**

HURWITZ, Circuit Judge, dissenting:

Before federal agents began questioning Heraclio Osorio-Arellanes in a Mexican prison, he received a *Miranda* warning in Spanish designed for foreign interrogations. The warning expressly informed him that he was entitled to consult with an attorney trained in the United States before answering questions, and there could be some delay in providing such an attorney.[1]  He does not contest

---

[1] The warning provided to Osario, entitled "Notification of the Rights of Suspects Under Foreign Custody," provided:

> We are representatives of the United States government. Although we may not be in the United States of America, the laws of the United States provide you with certain rights when dealing with us. Before we pose any questions to you, you must understand your rights.
>
> You have the right to remain silent. Even if you have already spoken with other persons, you do not have to speak with us at this time.
>
> Anything you say can be utilized against you in court.
>
> You have the right to speak with an attorney so that he may counsel you before we pose any questions to you.
>
> You have the right to have an attorney present during your questioning.
>
> If you do not have the means to pay for an attorney, you have the right to have one be designated to you before any question is posed to you, if you so wish.

that he understood the warning yet opted to answer questions from the agents after a brief consultation with a Mexican lawyer, whom he identified as "my attorney."  After receiving the advice at the center of this appeal from that attorney, Osorio made inculpatory statements concerning the murder of Customs and Border Patrol Agent Brian Terry. Those statements were introduced at his trial, and he was convicted.

The majority today overturns that conviction.  It does not find Osorio's confession involuntary nor any *Miranda* violation.  Rather, the majority holds that the conviction cannot stand because Osorio received ineffective assistance from his chosen Mexican lawyer during the interrogation.

In doing so, the majority plows significant new doctrinal ground.  Were we compelled to decide the issue of ineffective assistance on direct appeal, I might reach the same conclusion as the majority.  But we labor under no such compulsion.  The Supreme Court has counseled that "few [ineffective-assistance] claims will be capable of resolution on direct appeal." *Massaro v. United States*, 538 U.S. 500, 507 (2003); *see also United States v. McKenna*, 327 F.3d 830, 845 (9th Cir. 2003) (stating the general rule that ineffective assistance of counsel claims are "generally inappropriate on direct appeal.").

---

However, our ability to provide you an attorney at this time can be limited by the decisions that local authorities may have taken or by the availability of an attorney trained in the United States of America. If you decide to answer questions at this time, in the absence of an attorney, you have the right to stop answering them at any time.

The majority nonetheless decides to take up the ineffective assistance of counsel claim on direct appeal because it concludes that this is a case "(1) where the record on appeal is sufficiently developed to permit determination of the issue" and "(2) where the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." Majority Opinion at 13-14 (quoting *United States v. Jeronimo*, 398 F.3d 1149, 1156 (9th Cir. 2005)). But, this is plainly a discretionary decision, and in my view, "collateral review provides the appropriate forum for [Osorio's] ineffective assistance of counsel claim." *United States v. Miskinis*, 966 F.2d 1263, 1269 (9th Cir. 1992).

"The customary procedure for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack on the conviction under 28 U.S.C. § 2255. This is so because usually such a claim cannot be advanced without the development of facts outside the original record." *United States v. Birges*, 723 F.2d 666, 670 (9th Cir. 1984) (cleaned up). On the few occasions when we have found a record sufficiently developed to depart from this customary practice, that record was made in a judicial proceeding. *See*, *e.g.*, *United States v. Alferahin*, 433 F.3d 1148, 1160 n.6 (9th Cir. 2006); *United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991); *United States v. Hernandez*, 403 F. App'x 281, 282 (9th Cir. 2010). In contrast, the majority today relies heavily on the translation of Osorio's out-of court interrogation. The legend that accompanies that translation, however, carries a significant disclaimer: "The quality of the recording is not optimal and there is no video available so it is sometimes difficult to distinguish between speakers." The transcript includes over one hundred "unintelligible" markings.

Even if the transcript is properly considered, it contains no statement by Osorio that the Mexican attorney's advice caused him to make the relevant admissions. Although that is a reasonable inference from the transcript, it is only an inference; neither Osorio nor his Mexican attorney ever so stated, either in the transcript or anywhere else under oath in these proceedings and the arguments of his present counsel are not evidence. In my view, we would benefit from factual development of the record—and the findings of a habeas court—before reaching this conclusion. *See United States v. Miskinis*, 966 F.2d 1263, 1269 (9th Cir. 1992) ("The issue that a district court would be required to determine on collateral review is whether Miskinis would have taken advantage of an advice of counsel defense but for Mitchell's representation of him at the trial."). Before vacating the conviction, we should hear from Osorio and, if he claims that the advice led to his relevant admissions, have that testimony subjected to cross-examination. *See United States v. Rivera-Sanchez*, 222 F.3d 1057, 1060 (9th Cir. 2000) (finding record sufficiently developed "because the district court held a hearing" at which both the defendant and counsel testified about counsel's alleged ineffectiveness).

In addition, why Pimentel showed up at the prison (apparently without being contacted by Osorio), who hired him, and what he told Osorio during their pre-interrogation conference are, as the district judge aptly noted, "facts that I don't have." Nor do we. A more-developed record might well support the government's contention that although Osorio knew that he had the choice to wait for "an attorney trained in the United States," he knowingly decided to proceed with one whom he knew was not. If this were the case, the government's argument that Osorio ostensibly

waived his right to effective representation of United States-trained counsel might need to be reevaluated in a new light.

It may well be that the result reached by the majority today would not be altered by a 28 U.S.C. § 2255 proceeding in the district court.  But before vacating the conviction of a defendant who voluntarily admitted that he participated in the murder of a federal agent, I would prefer to at least make an attempt to have the "facts we don't have."  I therefore would affirm Osorio's conviction and require him to make his case for ineffective assistance of counsel in the first instance in the district court through a § 2255 motion.  I respectfully dissent.